COPY

1 **LEARNING RIGHTS LAW CENTER**
JANEEN STEEL, SBN 211401
2 E-mail: janeen@learningrights.org
INES KUPERSCHMIT, SBN 224562
3 E-mail: ines@learningrights.org
SOO YUN, SBN 251463
4 E-mail: soo@learningrights.org
ASAF ORR, SBN 261650
5 E-mail: asaf@learningrights.org
6 205 S. Broadway, Suite 1008
7 Los Angeles, CA 90012
Phone: (213) 489 – 4030
8 Fax:    (213) 489 - 4033
9
10
11 Attorneys for Plaintiff
Adam Robedeaux
12



FILED
CLERK, U.S. DISTRICT COURT
AUG 2 4 2010
13:51
CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

13
14                **UNITED STATES DISTRICT COURT**
15              **CENTRAL DISTRICT OF CALIFORNIA**
16
ADAM ROBEDEAUX,                    ) Case No. **CV10 6313** JFW
17 Plaintiff,                      )                       CR(x)
                                   )
18     vs.                         ) **COMPLAINT FOR RELIEF**
19                                 ) **FROM FINAL**
                                   ) **ADMINISTRATIVE HEARING**
20 ANTELOPE VALLEY UNION HIGH      ) **DECISION UNDER THE**
SCHOOL DISTRICT, a public entity,  ) **INDIVIDUALS WITH**
21 Defendant.                      ) **DISABILITIES EDUCATION**
                                   ) **IMPROVEMENT ACT;**
22                                 )
23 _____     )
24
25
26
27
28

Plaintiff, Adam Robedeaux, alleges as follows:

1.    Adam brings this action following a final decision rendered by the California Office of Administrative Hearings ("OAH") in a special education administrative hearing under the Individuals with Disabilities Education Improvement Act, 20 U.S.C. §§ 1415 *et seq.*, and designated as OAH Case No. 2010020521.   The decision is contrary to current federal and state case law, statutes and regulations, and is not supported by the evidence presented at the administrative hearing.

## JURISDICTION AND VENUE

2.    This action arises under the laws of the United States.   Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331, as this action arises under the Individuals with Disabilities Education Improvement Act (IDEIA).

3.    Venue is proper in this district under 28 U.S.C. § 1391(b) because Adam and District are residents of Lancaster, California, and because a substantial portion of the events described in this complaint occurred on the grounds of Eastside High School in Lancaster, California.   That location is within the Central District.

## THE PARTIES

4.    Adam is an eighteen-year-old senior at Eastside High School, a school within the Antelope Valley Union High School District.

5.    Defendant Antelope Valley Union High School District ("District") is a local educational agency organized and existing under the laws of the State of California.   District operates numerous schools including Eastside High School.

## FACTUAL HISTORY

*Medical Background*

6.    At age four, Adam was diagnosed with Charcot-Marie-Tooth Disease ("CMT"), a genetic, degenerative neuromuscular disease.   CMT causes muscle wasting and weakness in the legs, feet, arms and hands, making activities that rely on those muscles more fatiguing than normal.   Additionally, the lack of muscle in those areas makes people with CMT more sensitive to the weather.

7.    Adam's CMT is severe and has resulted in significant limitations on Adam's physical abilities.   Adam wears ankle-foot orthoses ("AFOs") to stabilize his legs and assist him to walk.   Even with the assistance of the AFOs, Adam walks slowly and is easily fatigued.   Nonetheless, it is still important for Adam to be moving and using his muscles.   Although Adam is sometimes able to use the stairs, the stairs are very fatiguing and dangerous.   In cold weather, Adam's muscles stiffen and his extremities are cold.

///

///

///

*Educational Background*

8.    In 1997, Adam was found eligible for special education instruction and services.   Adam has remained eligible for special education instruction and services since 1997.

9.    Currently, Adam is eligible for special education instruction and services under the categories of Specific Learning Disability (SLD) and Orthopedic Impairment (OI).

10.   Adam entered District in September 2007 as a ninth-grade student at Eastside High School ("Eastside").   Adam has remained at Eastside throughout his high school education.

*Transition Assessment and Services*

11.   Adam turned sixteen-years old on February 16, 2008, in the middle of his ninth-grade year.   District created a transition plan for Adam at his ninth-grade annual IEP on September 24, 2007.   District did not conduct any assessments prior to developing Adam's ninth-grade transition plan.

12.   Adam's transition plan states that District would provide Adam with Career Cruising, a career interest inventory.   In the ninth-grade, Career Cruising was the sole transition-related service offered by District.

///

///

13.   Career Cruising is a computer-based career inventory program.   The program presents students with questions and requests that students answer by selecting a facial expression that best suits the student's response to that question. Once a student completes the questions, the program compiles a list of careers. The student can then learn more information about the careers suggested by the program.

14.   Adam was given access to a computer to take the Career Cruising inventory on or around May 29, 2008.   The print out Adam received included careers such as tool and die maker, underground miner, crane operator, carpenter, welder, tile setter, electronics assembler, electrician, and pipe fitter.

15.   In September 2008, Adam completed a "Vocational Interview" as part of his triennial assessment.   That "interview" consisted of written responses to questions such as "have you ever had a job?" and "what do you like to study?"

16.   Michael Morgan, District's psychologist, conducted a triennial assessment on Adam, but did not include standardized tests designed to assess Adam's vocational skills, ability to be trained, or his independent living skills.

17.   District provided Adam the Career Cruising inventory a second time in his tenth-grade year.   The resulting list of suggested professions was similar to the prior list and included professions such as welder, tool and die maker, underground miner, and tailor.

18. That same year, Adam also began completing worksheets for his transition portfolio during math class. Those worksheets covered topics such as interest and hobbies.

19. District did not provide Adam with specific transition services to assist Adam in pursuing his interest in becoming a stock broker during his tenth-grade year.

20. In Adam's eleventh-grade year, Adam was enrolled in District's Youth Employment Skills (YES) as a transition service offered by District. For that class, Adam completed a resume, drafted a cover letter, and filled out a variety of worksheets regarding matters such as his personality, maintaining a budget, and housing. Additionally, the students in the class watched videos on topics such as interview techniques and maintaining good credit. Lastly, the teacher brought in people from the community to present about their professions as well as took the class on field trips.

21. Additionally, in late 2009, Adam became a client of the California Department of Rehabilitation (DOR) through a partnership between DOR and District. As a client of DOR, Adam began working at Game Stop, a video game retailer. Adam had difficulty completing the tasks required of him. As a result, Adam cut back his hours.

///

22.   District did not provide any transition assessment tool to Adam in his eleventh-grade year.

*Mobility and Access*

23.   Eastside's newly constructed campus, located at 3200 East Avenue J-8 in Lancaster, is a sprawling multi-building campus that accommodates approximately 2,400 students.   The Main Classroom Building contains two floors that are connected by staircases and elevators.   Eastside's library, career center, and computer lab are located on the second floor of the Main Classroom Building.

24.   Adam began attending Eastside's newly constructed campus during summer school in 2009.   Throughout summer school, Adam was permitted access through the "delivery gate," and entered the campus through the "classroom gate," so that he would have a shorter route to walk to the Main Classroom Building. There was no evidence that permitting Adam to access Eastside's campus through those gates caused any problems over the summer.   During summer school in 2009, Adam did not require access to the elevators because all of his classes were on the first floor.

25.   Adam did not feel fatigued at the end of each school day during summer school and did not need to rest after returning home from summer school.

26.   Once the regular school year began, Adam was no longer permitted to access the campus in the same manner he had throughout summer school.

Adam was required to enter the campus through the temporary main entrance. That entrance was 512 feet from Adam's first-period class. By comparison, the distance between the "classroom gate" and Adam's first-period class was 275 feet, nearly half the distance.

27.   Adam's class schedule required that he be upstairs for the final period of the day.   Although District permitted Adam to *use* the elevators, Adam had to wait by the elevator for a security guard to open and operate the elevator for him. On numerous occasions, Adam walked up the stairs after a security guard did not arrive on time to meet Adam at the elevator.   Additionally, on cold days, waiting for the elevator meant being outside for longer which affected the functionality of Adam's hands and feet.

28.   When Adam wanted to use the elevator at nonscheduled time, such as during lunch, Adam would have walk around the campus to locate a security guard to give him access to the elevator.   As a result, Adam did not use the resources on the second floor as regularly as he would have had he been given an elevator key.

29.   On September 1, 2009, District convened an IEP meeting to discuss Adam's mobility needs.   At that meeting, Adam's parents requested that District provide Adam with an elevator key and access through the "delivery gate" and

"classroom gate," requests that were supported by Dr. Saul Bernstein, Adam's prior treating orthopedist.

30. Both of those requests were rejected due to alleged safety and security concerns.

31. Instead, District offered an aide and a wheelchair to transport Adam between the front entrance and the Main Classroom Building at the beginning and end of the day. Adam's parents rejected that offer as it was against Dr. Bernstein's medical advice.

32. Following that IEP meeting, Adam continued having difficulty accessing Eastside's campus. The security guards were still late on a regular basis and Adam remained very tired after each school day.

33. District convened Adam's annual IEP on October 8, 2009. The IEP team again discussed Adam's mobility needs. District determined that Adam was eligible for special education services under the category of Orthopedic Impairment. That determination was made in order to permit District to access low incidence funding to purchase a motorized mobility device for Adam, despite Adam's parents previous objection to the wheelchair as against medical advice.

34. District convened a third IEP meeting on October 22, 2009. District decided to provide Adam's fifth- and sixth-period teachers the key to the elevator so that they could provide him access to the elevator. However, District did not

address Adam's difficulty accessing the resources on the second floor of the Main Classroom Building.

35.   Although Adam had less trouble getting up to his sixth-period class on the second floor, Adam's needs were far from being addressed.   Because Adam's sixth-period teacher was often busy at the end of class, Adam would take the stairs to avoid calling attention to himself by interrupting class to request access to the elevator.

36.   Adam would also regularly refuse to take rides from the security guards to avoid calling attention to himself.   As a result of District's persistent refusal to allow Adam to access Eastside's campus from the "classroom gate," Adam continued to experience fatigue as a result of the long distance he had to walk at the beginning and end of each day.

37.   District continues to deny Adam's requests for the elevator key and access to a closer entrance on the basis of safety, security, and liability. However, at hearing, the testimony of District's personnel indicated that those concerns are not significant.

## PROCEDURAL HISTORY

38.   Adam filed a due process petition with OAH on February 11, 2010. The petition alleged violations of Adam's right to a free and appropriate public education ("FAPE") beginning in February 11, 2008.   Pertinent to this appeal,

Adam alleged that District failed to provide him with FAPE because District: (1) did not conduct a transition assessment; (2) did not provide appropriate with transition services; and (3) did not provide the elevator key and access to a closer entrance as related services.

39.   OAH designated Adam's due process petition as OAH Case No. 2010020521.

40.   An Administrative Law Judge (ALJ) held a hearing in OAH Case No. 2010020521 on April 7, and 12-15, 2010, in Lancaster, CA.

41.   The ALJ rendered his decision on May 26, 2010, ruling in favor of Adam, in part, and against Adam, in part.   The final administrative hearing decision is attached hereto as Exhibit "A".

42.   The ALJ found that District's failure to conduct a transition assessment and the transition services offered by District did not deny Adam his right to FAPE.   Furthermore, the ALJ concluded that District did not deny Adam FAPE by failing to provide Adam with a key to the elevators in the Main Classroom Building or access to the closer entrance because District asserted security and liability concerns with providing those related services.

///

///

///

## FIRST CLAIM FOR RELIEF

### THE ALJ MISINTERPRETED THE REQUIREMENT THAT TRANSITION PLANS BE BASED ON A TRANSITION ASSESSMENT IN CONCLUDING THAT DISTRICT FULFILLED ITS TRANSITION-ASSESSMENT OBLIGATION UNDER IDEIA

43. Adam realleges and incorporates by reference paragraphs 6-37.

44. Pursuant to federal special education law, school districts are required to create a transition plan for students eligible for special education. 20 U.S.C. § 1401(a)(34)(B). That plan must be in place by the time the student turns sixteen. *Id.* § 1414(d)(1)(A)(i)(VIII). According to the Congressional findings accompanying the most recent reauthorization of the IDEIA, the purpose of transition planning is to ensure that student with disabilities are able to successfully enter higher education or employment following graduation. *Id.* § 1400(c)(14). To implement that outcome-oriented process, the IEP must include "appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills." *Id.* § 1414(d)(1)(A)(i)(VIII)(aa).

45. In Adam's ninth-grade year, District created a transition plan for Adam without having conducted assessments in any of the areas enumerated in the IDEIA.

46. The Career Cruising program, which Adam took eight months after District created a transition plan for Adam, does not assess students in areas such

as training, education, and independent living.  Moreover, that program is also not designed to account for the physical or other limitations of its users as evidenced by the professions the program recommended to Adam.

47.  Due to Adam's CMT, a disease which will have a variable effect on his physical abilities, assessments in the areas of training and independent living were essential to developing a transition plan that met Adam's unique needs and creating the outcome-oriented process envisioned by the IDEIA.

48.  The "Vocational Interview" conducted as part of the triennial assessment in Adam's tenth-grade year is equally insufficient as it did not assess in all of the areas enumerated in IDEIA.  Moreover, the triennial assessment did not include assessments to gauge Adam's abilities in areas such as independent living.

49.  Those deficiencies in Adam's tenth-grade year were not cured by District providing Adam with the Career Cruising program for a second time.

50.  In Adam's eleventh-grade year, District failed offer any transition assessments whatsoever.

51.  The ALJ erred in holding that the Career Cruising program satisfied District's obligation to assess and provide FAPE and failed to apply the law regarding transition assessments.  Consequently, the ALJ erred in concluding that District did not deny Adam FAPE during his ninth-, tenth-, and eleventh-grade

years despite never conducting a transition assessment, an indispensible element of the transition-planning process.

## SECOND CLAIM FOR RELIEF

**THE ALJ ERRED IN CONCLUDING THAT DISTRICT'S TRANSITION SERVICES WERE SUFFICIENT TO CONSTITUTE A PROVISION OF FAPE AS THAT CONCLUSION IS CONTRARY TO LANGUAGE AND SPIRIT OF IDEIA REGARDING THE UNIQUE NEEDS OF STUDENTS**

52. Adam realleges and incorporates by reference paragraphs 6-37.

53. In addition to creating a transition plan based on a transition assessment, school districts are required to provide transition services to students eligible for special education.   Federal law defines "transition services" as:

> a coordinated set of activities for a student with a disability that—(A) is designed within an outcome-oriented process, which promotes movement from school to post-school activities . . . ; (B) is *based upon the individual student's needs, taking into account the student's preferences and interests*; and (C) includes instruction, related services, community experiences, the development of employment and other post-school adult living objectives, and, when appropriate, acquisition of daily living skills and functional vocational evaluation.

20 U.S.C. § 1401(a)(34) (emphasis added).

54.   Since beginning high school, Adam has consistently stated that he wanted to become a stock broker or pursue a career in computer graphics or game design.

55.   However, in Adam's ninth-grade year, the sole transition service offered by District was the Career Cruising inventory.

56.   Similarly, in Adam's tenth-grade year, District offered Adam the following transition services: Career Cruising and a transition portfolio.

57.   The transition portfolio consisted of documents such as Adam's IEPs, printouts of Adam's results from the Career Cruising program, handouts on interviewing tips, and worksheets that repeatedly required students to complete information about their strengths, weaknesses, and interests.

58.   For Adam's eleventh-grade year, District offered Adam the following transition services: Career Cruising, creation of a career portfolio, and enrollment in the Youth Employment Skills (YES) class.

59.   As part of the YES class, Adam participated in various trips and programs, but none addressed Adam's career interests.   Additionally, Adam watched videos about interviewing skills and completed worksheets on topics such as money management.

60.   Adam's career portfolio consisted of resumes, cover letters, letters of recommendation, and job applications.

61.   Each of the transition services offered by District was unrelated to Adam's stated desire of becoming a stock broker or pursuing a career in computer graphics or game design; rather, the services offered were those already in place at District and in any way designed to meet Adam's individual needs.   Moreover, no one at District explained to Adam the requirements of those professions or what Adam could do in high school to begin preparing himself for one of those professions.

62.   Adam's experiences working at Game Stop underscored the shortcomings of the transition services offered by District, an offer that did not change to account for the difficulties Adam demonstrated in the work setting.

63.   Consequently, the ALJ erred in concluding that the transition services offered by District, which did not account for Adam's preferences and interests, provided Adam with FAPE.   That holding is in conflict with the applicable statutes, caselaw and purpose of the transition-related provisions of the IDEIA.

## THIRD CLAIM FOR RELIEF

### THE ALJ ERRED IN CONCLUDING THAT DISTRICT WAS NOT REQUIRED TO PROVIDE ADAM WITH A KEY TO THE ELEVATORS ON EASTSIDE'S CAMPUS OR ACCESS TO AN ENTRANCE THAT IS CLOSER TO ADAM'S CLASSES

64.   Adam realleges and incorporates by reference paragraphs 6-37.

65.   Under the IDEIA, school districts are required to provide related services to students with disabilities that enable the student to achieve annual

goals, "participate in extracurricular and other nonacademic activities", and "be educated and participate with other children with disabilities and nondisabled children." 34 C.F.R. § 300.320(a)(4). Among the related services contemplated by Congress are transportation services which include "[t]ravel in and around school buildings." 34 C.F.R. § 300.34(c)(16)(ii).

66. Determining whether a school district must provide a related service as part of a special education student's educational program requires a two-part analysis. First, does the requested service fall within the ambit of related services? Second, is the requested service required for the student to benefit from special education? *See Irving Indep. Sch. Dist. v. Tatro*, 468 U.S. 883, 890; 104 S. Ct. 3371, 3375-76; 82 L. Ed. 2d 664, 672 (1984) (outlining the process of analyzing whether catheterization is a "related service"). The second inquiry is informed by the purposes for related services outlined in 34 C.F.R. § 300.320(a)(4), and the unique needs of the student, *see* 20 U.S.C. § 1400(d)(1)(A) (defining purpose of IDEIA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living").

67. In *Tatro*, the school district suggested that the additional risk of liability was sufficient to warrant denying Tatro the catheterization service she

needed.   468 U.S. at 894 n12; 104 S. Ct. at 3378 n12; 82 L. Ed. 2d at 676 n12. The Court rejected that argument finding that

> [t]he introduction of handicapped children into a school creates numerous new possibilities for injury and liability.   Many of these risks are more serious than that posed by [catheterization], which the courts below found is a safe procedure even when performed by a 9-year-old girl.   Congress assumed that states receiving the generous grants under the Act were up to the job of managing these new risks.

*Id.*; 104 S. Ct. at 3378 n12; 82 L. Ed. 2d at 676 n12.   The Court further noted that if the school district was concerned with the potential liability, the school district could purchase more liability insurance or lobby the state legislature to enact legislation to limit its liability.   *Id.*; 104 S. Ct. at 3378 n12; 82 L. Ed. 2d at 676 n12.

        68.   The ALJ in Adam's case correctly presumed that the requested accommodations are well within the definition of "related services."   However, he never engaged in the second part of the analysis and instead concluded that District's concerns over safety, security, and liability overrode District's obligation to provide the requested related services.

69. The evidence presented at hearing demonstrated that the requested related services were needed for Adam to benefit from special education based on his unique needs. Without access to the closer entrance, Adam is fatigued by the time he arrives at his first-period class. Similarly, due to his particular medical condition, Adam should walk as much as possible to counteract the muscle degeneration and weakness in his legs.

70. Similarly, without an elevator key Adam would not be able to access the resources on the second floor (i.e. library, career center, and computer lab) in a meaningful way because each time Adam wanted to access one of those services he would have to walk around the campus to locate District personnel with an elevator key and then wait until that person was available to give him access to the elevator. Furthermore, although Adam is sometimes able to use the stairs, it is very fatiguing, painful, and dangerous for him to do so.

71. Those unique needs sufficiently justify Adam's requests and, in turn, obligate District to provide such services pursuant to District's duties under IDEIA.

72. Moreover, District's liability concerns are not sufficient to supersede its obligation to provide the requested accommodations as the "risks" posed by Adam's requested related services are minimal, at best. With regard to access through the "delivery gate" and "classroom gate," Adam had used that path to

access Eastside's campus throughout summer school without incident, school personnel and school vans drive in that area at times when students may be present, there is a parking lot behind the "delivery gate" with handicapped parking spaces, and District is able to coordinate access for emergency vehicles to have access through those gates.

73.   That analysis applies with equal force to District's refusal to provide Adam an elevator key.   If Adam were stuck in the elevator, the elevators are equipped with an emergency button that can be used to alert someone that he is stuck in the elevator.   All that is required to operate that button is the push the button and communicate with the person that answers.   There was no testimony that Adam would be physically unable to press the button.   As for District's concern that Adam could be unsupervised in the elevator, Adam, like all the other students in the school are unsupervised in a lot of areas throughout Eastside's campus, namely the bathrooms.   If District was so concerned about supervising the use of the elevators, District could install video cameras in each of the four elevators to monitor their use, something that could not be done in a bathroom.

74.   Consequently, the ALJ erred in concluding that District did not deny Adam his right to FAPE by denying his reasonable requests accommodate his unique needs and provide him the related service that would have provided Adam with meaningful access to his education.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

ON THE FIRST AND SECOND CLAIMS FOR RELIEF

1.   For a psycho-educational assessment on Adam conducted by an independent assessor acceptable to Adam;

2.   For a Transition assessment on Adam conducted by an independent assessor acceptable to Adam;

3.   For two-hundred hours of compensatory education in the form of one-to-one work with an independent transition specialist agreeable to Adam, with the hours to be utilized at any time, including days when school is not in session;

4.   For funding for one year of post-secondary education in a program of Adam's choosing;

5.   For attorneys' fees, interest, and costs as provided by law; and

6.   For such other and further relief as this Court may deem just and proper.

ON THE THIRD CLAIM FOR RELIEF

1.   Provide Adam with a key to operate the elevators on Eastside campus; and

2.   Provide Adam with access to drop-off and pick-up area adjacent to the Main Classroom Building that is closest to his classes.

3.    For attorneys' fees, interest, and costs as provided by law; and

4.    For such other and further relief as this Court may deem just and proper.

Dated: _8/24/10_

Learning Rights Law Center

By: _____

Asaf Orr, Esq.
Attorney for Plaintiff
Adam Robedeaux

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of:<br><br>STUDENT,<br><br>v.<br><br>ANTELOPE VALLEY UNION HIGH<br>SCHOOL DISTRICT. | OAH CASE NO. 2010020521 |

## DECISION

The due process hearing in this matter was held on April 7, 12, 13, 14 and 15, 2010, in Lancaster, California, before Clifford H. Woosley, Administrative Law Judge (ALJ), Office of Administrative Hearings (OAH), State of California.

Janeen Steel, Asaf Orr, Laurel Tierney, and Ines Kuperschmit, attorneys from the Learning Rights Law Center, appeared on behalf of Student.[1] Student was present on April 7 and 12. Student's Mother was present throughout the hearing and Student's Father was present once it was determined he would not be called as a witness.

Antelope Valley Union High School District (District) was represented by General Counsel Bridget L. Cook. Shandelyn Williams, District Director of Special Education, and Dr. Eric Beam, District Coordinator of Psychological Services, were present during the hearing.[2]

On February 11, 2010, Parents filed a request for due process hearing. On February 16, 2010, Student turned 18 years of age and became the sole holder of his educational rights. Hearing commenced on April 7 and was continued to April 12. At the close of hearing on April 15, the matter was continued to May 10, 2010, for the submission of closing briefs. On that day, briefs were filed, the record was closed, and the matter was submitted.

---

[1] Counsel from the Learning Rights Law Center appeared at various times during the hearing, usually determined by the witnesses and evidence to be presented on any particular day.

[2] Dr. Beam was present when Ms. Williams was unavailable.

1

ISSUES

1.     Whether District failed to provide a free and appropriate public education (FAPE) for the 2007-2008 school year because:

a)     The District did not assess in all areas of suspected disability,
b)     The District did not create goals in all areas of need,
c)     The IEP goals were not appropriate,
d)     The District did not offer sufficient support in the area of math,
e)     The District did not offer sufficient support in the area of reading,
f)     The District did not offer sufficient support in the area of writing,
g)     The District did not offer appropriate assistive technology, and
h)     The District failed to create an appropriate transition plan.

2.     Whether District failed to provide a FAPE for the 2008-2009 school year because:

a)     The District did not assess in all areas of suspected disability,
b)     The District did not create goals in all areas of need,
c)     The IEP goals were not appropriate,
d)     The District did not offer sufficient support in the area of math,
e)     The District did not offer sufficient support in the area of reading,
f)     The District did not offer sufficient support in the area of writing,
g)     The District did not offer appropriate assistive technology, and
h)     The District failed to create an appropriate transition plan.

3.     Whether District failed to provide a FAPE for the 2009-2010 school year because:

a)     The District did not assess in all areas of suspected disability,
b)     The District did not create goals in all areas of need,
c)     The IEP goals were not appropriate,
d)     The District did not offer sufficient support in the area of math,
e)     The District did not offer sufficient support in the area of reading,
f)     The District did not offer sufficient support in the area of writing,
g)     The District did not offer appropriate assistive technology,
h)     The District failed to create an appropriate transition plan,
i)     The District failed to convene an IEP meeting when Student demonstrated a lack of anticipated progress,
j)     The District failed to provide necessary and reasonable accommodations as part of Student's Individualized Education Program (IEP), and
k)     The October 8, 2009 annual IEP failed to include adequate present levels of performance.

2

FACTUAL FINDINGS

1.     Student is a junior at Eastside High School in the District, who turned 18 years old soon after the filing of this due process request by his Parents.  At all relevant times, Student was a resident of the District and eligible for special education under the category of Specific Learning Disability (SLD).

2.     Student has Charcot-Marie-Tooth disease (CMT), which is a genetic, degenerative, neuromuscular disorder.  CMT affects motor and sensory nerves.  A typical feature includes weakness of the foot and lower leg muscles, which may result in foot-drop and a high-stepped gait with frequent tripping or falls.  To assist, Student wears braces on each leg for support, from foot to knee.  Student is prone to getting cold and physically tired.  As CMT progresses, weakness and muscle atrophy may occur in the hands, resulting in difficulty with fine-motor skills.   No evidence was presented regarding the extent to which CMT affects Student's fine-motor skills.

3.     Student's Mother testified at the hearing.  Student started elementary school in the Lancaster School District.  He struggled academically in kindergarten and was held back a year, to see if his struggles were developmental.  The school then tested him in first grade, when he continued to perform significantly behind his peers.  Student was found eligible for special education services; Mother was unsure of the actual eligibility criteria.  Mother was told he was dyslexic[3] and that Student required services for speech.  Student was in a general education (GE) class, with pull-out resource at the end of the day.  He had speech therapy for a couple of years.

4.     At middle school, he had push-in resource for his GE class.  Student had difficulty keeping up with the program.  After one-and-one-half years, Student went to another middle school, where he had traditional resource services.  Student continued to struggle to keep up and was writing poorly, not close to grade-level.  Finally, in eighth grade, Student went into a special day class (SDC).

5.     A transition IEP convened January 26, 2007, which stated that Student should continue in the SDC and APE when he transferred to the District's Eastside High School for ninth grade.  A hand-written entry referred to "books on tape" under assistive technology in the transition IEP but there was no evidence Student used books on tapes prior to enrolling in the District.

6.     Student's Spring 2007 California Standardized Testing and Reporting (STAR) tests were far below basic, which raised concerns for Mother, who knew her son was struggling.

---

[3] A resource teacher said that Student was dyslexic but, to Mother's knowledge, no formal testing was conducted.  Student's dyslexia was reported in his prior IEPs and was thereafter taken as a given by the IEP teams.

3

7.      Student testified at hearing.  Student is slow to speak and likable.  He confirmed CMT as his physical disability.  He described his educational disability as severe dyslexia, but he was unsure when he was diagnosed and who diagnosed him.  Student's testimony is referred to throughout these factual findings.  Student's demeanor was congenial but somewhat detached.  Student would often say he was unsure after answering a question.  His testimony regarding what, when and to whom he made a particular statement was frequently imprecise.  Notably, Student's testimony exhibited a general attitude that he does not want to "stick out."  Of the reasons given as to why he did not use his AT machines or other mobility devices, the most common was that he did not want to call attention to himself as being different.  Though Student said that he actively participated in his IEPs, the IEP documents themselves do not record significant participation by Student, other than his presence.  This was confirmed by a number of District personnel who attended Student's IEP meetings.  Generally, his testimony confirmed the concerns expressed in some of his IEP transition goals relative to lack of self-awareness and self-advocacy, which could be interpreted as disinterest.

8.      In the summer of 2007, Student attended summer school at Eastside High School in a SDC, which Mother described as an "amazing" class.  The campus was small at the time because the classes were in temporary trailers; the District was in the midst of constructing new Eastside facilities.  He received 10 credits and a grade of B for two summer classes:  Math Seminar and Reading/Writing Seminar.

*2007-2008 School Year*

9.      Student's first IEP meeting at the District was an annual review held on September 24, 2007.[4]  The IEP specified assistive technology as one of the meeting's purposes.  Attending were: Student; Mother; Father; Student's attorney, Warren Finn; District administrator Matthew Anderson; general education teacher, Tizoc Estrada; District nurse, Olga Magana; AT technician, Eddie Cook; special day class (SDC) teacher, Lisa Chapleau; and the District's general counsel, Bridget L. Cook.

10.     The IEP affirmed Student's eligibility of specific learning disability in basic reading, reading comprehension, and written expression.  Student was identified as having a processing disorder in visual and auditory processing, and sensory-motor skills.  Mother thought other health impairment (OHI) was a secondary eligibility because of the CMT.  The IEP does not include OHI as a secondary eligibility.  The IEP documents Student's summer school attendance, earning 10 credits toward the 230 credits needed to receive a District high school diploma, along with his senior project, Algebra I, and passage of the California High School Exit Examination (CAHSEE).

---

[4] Though this IEP was held more than two years before the February 11, 2010 due process filing, the IEP is relevant because it was in effect as of February 11, 2008, the beginning of the statute of limitations period.  (See 20 USC § 1415, subd(b)(6)B)).

4

11.     Consistent with the services provided the prior year, the IEP team affirmed Student's need for SDC instruction, with more than 54% of his school day in special education.  Student's academic classes were in a SDC.  Student was also enrolled in a general education guitar class and an adaptive physical education (APE) class.

12.     One of the stated purposes of the annual IEP was to review Student's assistive technology-related services, which were provided as part of Student's IEP services from the former district.  Student required assistive technology devices and services in order to meet goals and objectives and to access the core curriculum per assessment.

13.     Assistive Technology Technician, Eddie Cook, testified at the hearing.  He has worked nine years for the District, starting as a one-on-one aide and, a short time later, becoming a paraeducator speech/language assistant.  In August 2006, Mr. Cook became the District's sole Assistive Technology Technician (ATT).  Mr. Cook received an associate's degree in liberal studies from the Antelope Valley Junior College, after which he started working for the District.  He possesses an assistive technology certificate from California State University – Northridge.  He does not belong to any professional organizations nor is he credentialed in speech and language therapy.  He does the assistive technology assessments for the District and provides students with low- and high-tech aides, to assist students in accessing the curriculum.  He orders and keeps track of needed technology, counseling others on technology use.  Mr. Cook had not previously testified at a due process hearing as the ATT.  In preparation for his testimony, Mr. Cook reviewed the IEPs and assessments, including an assistive technology (AT) assessment from September 2006.[5]

14.     Mr. Cook stated that Student came to the District with two types of AT: colored overlays to assist with dyslexia (in colors specified by Mother); and an AlphaSmart. Before Student arrived at District, Mr. Cook ordered AlphaSmart.  Both AT devices were provided Student when he started the ninth grade.  Mr. Cook recalled that the AlphaSmart had no speaker function or word prediction software and he was unaware of its printing capability.  Mr. Cook did not know if the overlays assisted Student when using the AlphaSmart's black and white screen.  District personnel generally confirmed that Student was given the colored overlays.

15.     Prior to the September 2007 IEP, Mr. Cook did not conduct any additional AT assessments.  Instead, he relied on the prior district's 2006 AT assessment.  Student and Parents did not ask for an AT assessment at the September 2007 IEP.  Mother testified that Student did not like the AlphaSmart and had difficulty because the screen was too small and the keyboard was difficult for him to use.  Mother testified that she told the IEP team that the family wanted to give back the AlphaSmart because Student was not using it.  The IEP documents did not contain any reference to Mother's alleged statements.  Student testified he was having difficulties with the AlphaSmart, but he could not recall telling anyone at the September 2007 IEP.  Other team members testified that no one from the family told the

---

[5] The September 2006 AT assessment was not produced at hearing.

team that Student had problems with the AlphaSmart. The September 2007 IEP team was not informed of Student's difficulties with the AlphaSmart.

16.     Student testified that he first received the AlphaSmart in eighth grade (Lancaster School District) and that he told his Parents and teacher that he had a problem seeing the screen. He said he tried to use the AlphaSmart in middle school. He did not recall if the teacher or Parents did anything relative to his complaint. After he started high school, he would take his AlphaSmart to classes, but he did not regularly use it. He tried to take some notes, but could not keep up.

17.     During the September 2007 IEP meeting, Mr. Cook learned that Student had not received any formal keyboarding training. Eastside High School did not offer a typing class; the school computer class was not a typing class. Therefore, Mr. Cook suggested that Student begin using keyboarding/typing software, called the SpongeBob SquarePants Typing program (SpongeBob). The IEP narrative documents this discussion, indicating that Mr. Cook was going to order the program and install it on a computer in the student support center. Additionally, the IEP stated that the SpongeBob program would be provided to Student to use at home.

18.     Mr. Cook gave the SpongeBob program to families and students to help students develop typing skills. Mr. Cook has minimally used the program himself, but thought the SpongeBob program appropriate for the Student. With more sophisticated technology, like the AlphaSmart, Mr. Cook maintained a lending form for the AT equipment. Parents receive a copy of the form because they usually have to sign for the equipment. Mr. Cook did not require a lending form for the SpongeBob program because Mr. Cook furnished the program to students and families to keep.

19.     Mr. Cook credibly testified that he gave the SpongeBob program to the family at the September 2007 IEP. Mother does not recall this, stating that she did not receive the SpongeBob program until September or October 2009. Similarly, Student does not recall having the SpongeBob program at home until the fall of 11th grade. Mr. Cook specifically recalls giving the SpongeBob program at the IEP because it was his last copy, which is why the IEP stated that he needed to order the program to install on a computer in the student support center. Mr. Cook stated that the family indicated they had a computer to run the program at home. Mr. Cook testified that he had thereafter checked in with Student about his typing and Student never told him that he did not have the program or a computer upon which to run the program.

20.     Mr. Cook did not believe "books on tape" was part of Student's IEP AT services and does not recall the September 2006 AT assessment referring to "books on tape" as an AT service for Student. Other than the hand-written reference in the January 2007 transfer IEP from Lancaster District to Antelope Valley Union High School District, no testimony, assessment or IEP supports the contention that "books on tape" was part of Student's IEP AT-related services. Accordingly, "books on tape" was not part of Student's AT services before or after coming to the District.

21.    The IEP team recommended that Student enroll in a "computer type" class to improve his computer skills.  Student testified that he was not regularly using the AlphaSmart when he started his high school classes.  The IEP team admonished the Student to bring the AlphaSmart to school and to use it.[6]

22.    Mother expressed her concerns to the IEP team about Student's ability to follow instructions, his reading level and his poor STAR scores, but felt the IEP team did not adequately explain Student's reading level.  She also stated that the only reading goal was in comprehension.  She did not believe Student could write an essay.  Neither the IEP nor other IEP team members confirmed that Mother stated these concerns at the IEP meeting.

23.    Lisa Chapleau was the attending special education teacher and testified at the hearing.  Ms. Chapleau is a credentialed special education teacher at Eastside High School and has worked for the District as a special education teacher for 11 years.  Ms. Chapleau is Student's case carrier and is in charge of IEP timely scheduling, with the correct people in attendance.  She also ensures that other teachers are aware of modifications and accommodations, along with goals and objectives, which are based on state standards.  She attended all of Student's IEP meetings and acted as the IEP scribe, typing in as much as she could of the team's discussions.  Ms. Chapleau worked with Student on transition issues.  Ms. Chapleau was very knowledgeable of Student, the IEPs, the issues discussed at the IEP meetings, and the services provided.  Ms. Chapleau was very forthcoming in her testimony, even transparently acknowledging an error in the KTEA II testing.  Ms. Chapleau was a very credible witness.

24.    At the IEP meeting, Ms. Chapleau stated that Student had met his goals from the previous year's IEP.  Therefore, the IEP team developed new goals in reading, math, writing, and transition with corresponding objectives and benchmarks, after noting Student's Present Levels of Performance (PLOP) in each area.

25.    Ms. Chapleau stated that Student has average cognitive abilities.  She reviewed the PLOPs and goals for Student in the September 2007 IEP.  For reading comprehension, Student's PLOP identified a Lexile[7] score of 232, taken as part of the READ 180 test in August 2007.  Student was enrolled in the READ 180 class.[8]  Ms. Chapleau stated that the reading comprehension Lexile score was Student's baseline for starting the READ

---

[6] As the year progressed, Student did not use the AlphaSmart.  Mother, Student, and Mr. Cook all referred to Student's resistance to using the AlphaSmart, for reasons that varied with each witness.

[7] A Lexile measure is information about either an individual's reading ability or the difficulty of a text, like a book or a magazine article.  A student gets the Lexile reader measure from a reading test or program.  When used together, Lexile measures help a reader find books and articles at an appropriate level of difficulty and determine how well that reader will likely comprehend a text.

[8] READ 180 is a reading program designed for students in elementary through high school whose reading achievement is below the proficient level. The goal of READ 180 is to address gaps in students' skills through the use of a computer program, literature, and direct instruction in reading skills.  The software component of the program aims to track and adapt to each student's progress.

7

180 course and indicated a reading level below his current grade level. Lexile scores assist in matching reading materials with Student's abilities. Ms. Chapleau explained at the hearing that the READ 180 class employs two levels for reading: an instructional level, which matches reading material with the student's reading level; and an independent level, which provides reading materials above the student's reading level, thereby increasing reading skills. Student's baseline score was used to assist in measuring Student's progress.

26.     As implemented at Eastside, the READ 180 program is a two-year program designed to improve a student's reading skills and comprehension. The computer program component tracks the student's progress and provides material designed to systematically improve the student's skills. Students do not progress until the student acquires the necessary skills. A student could not advance to the second year of READ 180 unless the student met the goals and objectives of the first year. Those witnesses who addressed the READ 180 program class stated that the goals and objectives are built into the program's systematic study structure and are designed to address a student's unique needs, which the READ 180 program regularly measures and adjusts. Ms. Chapleau said the READ 180 course was discussed and explained at the Student's IEP.

27.     The IEP noted that Student needed improvement in reading comprehension to be successful in school. Student's visual and auditory processing and sensory-motor skills could cause Student difficulty in following instructions presented orally and visually in the general education classroom. Student's reading goal was to maintain 75% criteria for a period of 10 weeks on questions about important elements of a test about Student's independent reading level, implemented by the special education teacher. The reading goal listed three objectives or benchmarks, each being a measurable ability to: identify facts from a reading passage, by January 2008; determine meaning by the context of a sentence, by March 2008; and draw conclusions from a given reading passage, by June 2008.

28.     For algebra and functions, the PLOP noted that Student scored 256 on the California Standardized Testing and Reporting (STAR), which he took in Spring 2007, placing Student far below basic. Student scored in the 55th percentile in measurement, 35th in rational numbers, and 30th in exponents. On the same test, Student scored 10% on multi-step problems, demonstrating a need to improve understanding how to do multi-step problems so he could be successful in algebra. Student's annual goal (by September 2008) was to solve multi-step problems with a variable, including word problems, by maintaining a 75% criteria for a period of 10 weeks on tests and work samples, implemented and measured by the special education teacher. The math goal listed three objectives or benchmarks, each being a measurable ability to: solve two element equations containing one letter, box or other symbol, by January 2008; solve mathematical expressions that use parentheses using correct order of operation, by March 2008; and use the correct order of operations to evaluate algebraic expression, by June 2008.

29.     For Writing Applications, the PLOP noted that Student was able to write simple sentences and a paragraph with a complete thought, but needed to expand his sentence-writing into more complex sentences. Student's annual goal (by September 2008)

8

was to demonstrate an understanding of proper English usage and sentence structure, when given a written/verbal prompt, by maintaining a 75% criteria for a period of 10 weeks on tests and work samples, implemented and measured by the special education teacher. The writing goal listed three objectives or benchmarks, each being a measurable ability to: combine two short sentences into a compound sentence using a conjunction, by January 2008; combine two shorter sentences into a complex sentence, by March 2008; and use simple, compound, and compound-complex sentences, to express complete thoughts, by June 2008.

30.     The September 2007 IEP included a Transition to Adult Life plan, listing Career Cruising as the primary tool. Career Cruising is a computer-based program that administers various questionnaires and provides information about different careers. The program provided Student with a list of about 40 different careers. By merely "clicking" on a career, the program provided information, such as employment opportunities, pay scale, and educational requirements. Student could also print out materials about any particular career for further study. Student completed Career Cruising in the ninth grade. Transition services included vocational guidance, with career-interest testing, with Student on a general curriculum course of study. Ms. Chapleau stated that the ninth grade transition goal is not merely to state what the Student thought he wanted to be, but instead, to provide Student with the tools necessary to evaluate his abilities and to explore career options.

31.     The September 2007 IEP team collectively addressed Student's transition plan. A transition specialist was not present since one usually does not attend freshman or sophomore IEP meetings. The Transition PLOP stated that Student was interested in becoming a stockbroker. The Transition annual goal (by September 2008) was for Student to learn about and be able to explain his disability and the accommodations he needed in order to be successful in school and ultimately in the work place. The Transition goal listed two objectives or benchmarks: Student would learn about his particular disability and necessary accommodations, by June 2008; and Student would be able to explain and write about his disability, by June 2008.

32.     The IEP also provided for a "hot pass" that would allow Student additional time to transition between classes or permission to go to the health office.

33.     The September 2007 IEP offer was approved by the entire team and signed by Student, Mother, Father and Student's attorney.

*The November 2007 IEP*

34.     An IEP meeting was held on November 2, 2007, for the sole purpose of adding adaptive physical education (APE) goals to Student's current IEP. The PLOP for motor skills development noted that Student attended the APE class, used the weight room equipment properly, and gave a great effort. The team recommended that Student should continue to try and improve his trunk strength, recommending Student continue to attend the APE class with appropriate goals and objectives. An APE goal was developed that Student

9

perform 20 cross-arm sit-ups in one minute, in three out of five trials, over a period of 10 weeks, as implemented by the APE teacher, classroom teacher and Parent. The IEP Minutes recorded the Mother's stated concern that Student was currently then getting an "F" in Guitar, Student's only general education class, and that Student was not being allowed to make up tests. No other issues were noted and the IEP was signed as approved by Student and Mother. No other IEP meetings were held during the 2007-2008 school year.

*2007-2008 School Performance*

35.     A March 1, 2008 progress report stated that Student made: some progress toward his second reading objective, progress toward his second math objective (with the note that the goal should be continued), some progress toward his second writing objective, and some progress toward the second APE objective. The next Transition goal objective was for June 2008 and, therefore, was not addressed.

36.     A May 22, 2008 progress report stated that Student made: some progress toward his third reading objective, progress toward his third math objective (with the note that the goal should be continued), progress toward the transition goal's second benchmark (with the note that the goal should be continued), and some progress toward the third APE objective. The progress report was silent as to the third writing objective.

37.     Student's spring 2008 STAR testing score in English was far below basic. Student did not take the other three components of the STAR for 2008. Student's grades for the first and second semesters of his freshman year were: D and D, in Healthful Living; A and C, in Literature Support 1; C and B, in Beginning Guitar; A and A, in APE; A and C, in English; and D and D, in Pre-Algebra.

38.     Student attended school at Eastside in the summer of 2008. He received 10 credits for two classes. He got a grade of C in the Math Seminar and a grade of B in the Reading/Writing Seminar.

*2008-2009 School Year*

39.     On September 23, 2008, Mother signed a Student Assessment Plan, authorizing District to conduct assessments in preparation for Student's upcoming triennial IEP. The assessment plan contemplated assessments in pre-academic/academic achievement, cognitive development, psychomotor development, and medical, health and development. The assessment would also include a hearing and vision screening. With the Student Assessment Plan, District provided Parents with a Notice of Intent to Conduct Pupil Assessment. The notice informed Parents of the applicable timeline for new assessments, as well as an invitation to make an appointment with staff to discuss procedures and tests to be used in the assessment process. The notice also informed Parents that they have the right to have someone else assess Student and offered to explain the procedure to them upon request. Mother also signed the Notice of Intent.

40.     School psychologist Michael Morgan testified at the hearing.  He prepared the Psychoeducational Summary Report for Student, which was presented at an October 16, 2008 triennial IEP meeting.  Mr. Morgan had been the school psychologist for 10 years.  He conducts assessments, speaks with parents, does student observations, administers testing, and interprets the results of tests conducted by other district employees (primarily by reviewing their summaries).   Before working for the District, Mr. Morgan worked two years for the Lancaster School District and one year of independent practice.  In his 13 years, he has conducted in excess of 750 psychoeducational evaluations.  Mr. Morgan has a bachelor of arts degree in psychology and a masters in education, with a psychology specialization. He is credentialed with a specialization in school psychology but is not licensed as a school psychologist.  Mr. Morgan presents workshops for District teachers and assists in developing programs for students disabled with emotional disturbance (ED).  Students training to be school psychologists have interned with Mr. Morgan.  Two years ago, he attended the National Association of School Psychologists meeting and is a past member of the California Association of School Psychologists (CASP), through which he participated in conferences and workshops.  He has had professional development through in-service training with the District.  As a school psychologist, Mr. Morgan possessed all the required qualifications, experience and training to conduct assessments, including the administration and interpretation of standardized tests, and development of IEP goals and objectives.  Mr. Morgan testified in a careful and knowledgeable manner and his testimony was generally persuasive.

41.     Prior to conducting the assessments, Mr. Morgan researched Student's neuromuscular disorder CMT.  He did not interview Parents as part of the psychoeducational assessment.  Mr. Morgan did not observe Student in class.  As part of the preparation of the psychoeducational assessment, Mr. Morgan reviewed and relied upon the psychoeducational report of January 14, 2005.  Mr. Morgan could not recall how much he used this 2005 assessment in analyzing his own testing of Student.  The 2005 assessment notes that Student had significant difficulties with fine-motor skills and became easily fatigued during written tasks.  In addition, the 2005 summary indicates that Student was diagnosed with ADHD, but also said that Student was not demonstrating consistent attention problems.

42.     Mr. Morgan had previously attended Student's IEP meetings in 2007.  He noted in his report that Student was identified as dyslexic but did not recommend testing for dyslexia at those meetings.  Dyslexia is weakness in the areas of reading, affecting a student's basic reading, reading comprehension, spelling, and written expression.  Dyslexia is assessed by giving an academic assessment, an intellectual ability assessment and a processing battery.  The processing battery includes tests for visual-motor integration, motor-free visual perception, and auditory processing.  For the 2007-2008 school year, Student's classes were all special education classes, except for Guitar.  However, when computing the percentage of time in which Student is in general education during the school day (46%), the time computation includes time outside the special education classes, such as lunch or other free time.

11

43.     Mr. Morgan's Psychoeducational Summary Report confirmed that Student had
a specific learning disability (SLD) and had average cognitive ability.  Mr. Morgan used the
following evaluation procedures: records review (back to the last triennial in 2005); Student
interview dated 9/18/2008; Behavior Assessment for Children, Second Edition (BASC-2) –
Self Report (ages 12-18) dated 9/23/2008; BASC-2 – Teacher Rating Scales (ages 12-21)
dated 9/22/2008; Developmental Test of Visual-Motor Integration, Fourth Edition dated
9/18/2008; Motor-Free Visual Perception Test, Third Edition dated 9/18/2008; Kaufman Test
of Educational Achievement, Second Edition (KTEA II); Sentence Completion Form dated
9/18/2008; vocational interview dated 9/18/2008; Test of Auditory Processing Skills, Third
Edition dated 9/24/2008; and Kaufman Brief Intelligence Test, Second Edition dated
9/23/2008.

44.     The achievement scores indicated that Student was deficient in all areas of
academic achievement except for math concepts and applications.  Student did not have an
auditory disorder but did have visual processing and sensory-motor skills disorders.  Student
has a discrepancy in reading and written language.

45.     Mr. Morgan was aware that Student had been diagnosed with dyslexia, which
he confirmed using the following tests: visual-motor integration, motor-free visual
perception test, auditory processing, and the Kaufman Brief Intelligence Test.  The visual-
motor integration test measures how the brain interprets and integrates visual information
into motor ability.  Student was asked to reproduce drawings, requiring Student to use his
hands.  Student had a VMI score of 7, with a standard score of 78, demonstrating a
significant discrepancy between intellectual ability and his performance on the subtest.  Mr.
Morgan recorded the test results in the summary report.  Though Mr. Morgan did not use the
term "dyslexia," the test results confirm dyslexia as a condition of Student's specific learning
disability.  Mother did not realize Student was tested for dyslexia.

46.     The BASC-2 includes tests related to attention deficit.  Mr. Morgan concluded
from his administration of the BASC-2 that Student did not have attention problems.
Instead, Mr. Morgan noted that Student's behavior problems were that he sometimes broke
the rules or disrupted other students' activities.

47.     The 2008 assessment had written components, including the Sentence
Completion Form and the written component section of the KTEA II.  Some of Student's
responses in these sections were longer than one sentence and one paragraph but none were
longer than a five-paragraph essay.

48.     Ms. Chapleau conducted the KTEA II testing for the Psychoeducational
Summary Report.  She gave the scores to Mr. Morgan, the school psychologist; she did not
give him the raw test materials.  Ms. Chapleau administered the testing protocols for the
areas in which Student was being tested.  Student completed a Student Response Booklet for
the KTEA II testing.  Ms. Chapleau then scored the responses.  Ms. Chapleau explained at
hearing that she wrote the wrong score for two of about 60 measures of Student's responses

to prompts in written expression.  These two mistakes did not significantly affect the reliability of the KTEA II results.

49.     In his testimony, Mr. Morgan discussed the areas of discrepancy between the achievement tests from the 2005 triennial IEP with those conducted in 2008, which was reflected in the records review portion of the 2008 psychoeducational summary report. KTEA II standardized test was conducted in 2008, while Woodcock-Johnson III (WJ-III) standardized tests were used in 2005.  Student's 2005 triennial IEP indicated that the WJ-III score for Letter-Word Identification was 73; the 2008 KTEA II score in the same area was a 66.  In 2005, Student scored a 77 in reading comprehension; in 2008, a score of 70.   Mr. Morgan acknowledged that the KTEA II and WJ-III standardized test scores both assess levels of academic achievement and are comparable.  However, Mr. Morgan stated that a decrease in the raw numerical scores does not mean a loss of academic skills.  The scores are comparisons among same-aged peers.  A decrease in a score may simply mean that the Student did not acquire additional skills at the same rate as his peers.  A better measure of Student's progress was that Student continued in the 10th grade with the second level of READ 180, having tested into the second level from his ninth grade year.  Mr. Morgan stated that the 2008 triennial IEP meeting addressed Student's reading comprehension needs with goals and objectives.

50.     The psychoeducational assessment included a vocational interview with Student, who indicated a desire to work in the stock market.  Mr. Morgan did not further address transitional services in the report.  Student was already receiving the services and building a portfolio in the areas of interest, which was addressed by the IEP team.

51.     In his report, Mr. Morgan noted that Student had CMT Disease and recommended that the triennial IEP team discuss whether other health impairment (OHI) should be considered a secondary eligibility.  In doing so, Mr. Morgan noted that the disease could cause, in addition to the loss of gross motor strength and skills, progressive arm weakness as distal muscles atrophy.  The IEP team should discuss whether the disease limited Student's vitality and alertness, which adversely affected educational performance.

52.     Mr. Morgan explained at hearing that a triennial assessment is different from an initial assessment because there are prior records, evaluations and IEPs.  Testing for a triennial is not viewed in isolation.  A triennial assessment incorporates information from many sources, such as teachers.  Looking at standardized test scores in isolation can be misleading.  For example, a poor performance on a test might be explained by a teacher who noted a student's problem with health or energy.

53.     Mr. Morgan concluded that Student received educational benefit in reading since his freshman year annual IEP, to the present, as indicated by an increasing Lexile score, year after year.  Student also received educational benefit in math, as indicated by the STAR testing baseline in 2007 increasing by 2008.  Student received educational benefit in writing as indicated by Student's progress towards the IEP goal and objectives for writing application.  Student's progress can be demonstrated by means other than one-on-one testing

of a student. Lexile scores, classroom grades, CST scores, non-standardized measures, in addition to the standardized STAR and CAHSEE scores, were all considered. Since the triennial 2008 Psychoeducational Summary Report, Mr. Morgan has not received or seen any information regarding Student which would cause him to change anything in the report.

54. Student's triennial IEP was convened on October 16, 2008. Attending were: Student; Mother; Father; District administrator Matthew Anderson (though he did not sign the IEP); general education teacher, M. Lopez; District nurse, Olga Magana; special day class (SDC) teacher, Ms. Chapleau; adapted PE specialist, Chris Malloy; and the District's school psychologist, Mr. Morgan. The assistive technology technician, Mr. Cook, was not present and the team agreed to reconvene later to address Student's assistive technology needs.

55. Mr. Morgan's Psychoeducational Summary Report was reviewed by the team.

56. The team also received the Nursing Service Plan report. The nurse conducted an assessment, evaluating Student's physical, cognitive, and emotional impairment on functioning, using a five-point scale. Student ranked number one, which meant that he was independent in his ability to perform his own personal daily care without human assistance. The nurse noted that Student used bilateral AFO (ankle-foot orthoses) braces to lower extremities at all times, because of the CMT condition, and that Student could not ambulate without them. Student passed the hearing and vision screening, and was current on all immunizations. The nurse concluded that Student did not require a standardized or an individualized school healthcare plan.

57. The IEP team considered whether Student's CMT disease limited his vitality and alertness, which adversely affected educational performance. The team discussed CMT, which is characterized by degeneration of the peroneal muscles of the lower leg bone, resulting in clubfoot, foot-drop and unsteady gait. CMT could cause Student to tire easily. He could not stand for long periods of time or walk fast. CMT could also lead to progressive arm weakness because of distal muscles atrophy. The team decided to add OHI as a secondary disability.

58. The attending special education teacher reviewed Student's progress, stating that Student had met his goals from his last IEP. Therefore, the IEP team developed new goals in reading, math, writing, transition (self-awareness), transition (self-advocacy), and APE, with corresponding objectives and benchmarks, after noting Student's Present Levels of Performance (PLOP) in each area.

59. For reading comprehension, Student's PLOP was based upon his KTEA II test in September 2008 in which Student received a standard score of 70. Letter & Word Identification, for which Student had a standard score of 66, was noted as an area in which he

14

needed improvement.  Student's visual processing[9] and sensory-motor skills could cause
Student difficulty in following instructions presented orally and visually in the general
education classroom.  Student's reading goal was for Student to use knowledge of antonyms,
synonyms, homophones and homographs to determine the meaning of words, as measured by
work samples and observation record maintenance, with 75% accuracy, implemented by the
special education teacher.  The reading goal listed three objectives or benchmarks, each
being a measurable ability to:  use antonyms to determine the meaning of words, by
December 2008; use synonyms to determine the meaning of words, by March 2009; and use
homophones and homographs to determine meaning of words, by June 2009.  As noted by
Ms. Chapleau and other witnesses, Student was in the second year of the READ 180 class,
which required Student to have passed the READ 180 benchmarks for the first year.

60.    Mother remained deeply concerned about Student's reading.  She observed
Student struggling in reading and writing.  Mother testified that Student was always asking
her or his little brother what things meant.

61.    In the area of Math, the PLOP noted Student scored 85 on the KTEA II
Concepts and Applications math test, indicating needed improvement in Math Computation,
in which Student scored 82.  Student's annual goal (by October 2009) was, with core
curriculum materials, to apply algebraic order of operations and the commutative,
associative, and distributive properties to evaluate expressions, justifying each step in the
process, with 70% accuracy, as implemented and measured by the special education teacher.
The math goal was broken down into three objectives, each being a measurable ability to
apply algebraic order of operations and: the commutative property to evaluate expressions,
justifying each step in the process; the associative property to evaluate expressions, justifying
each step in the process; and the distributive property to evaluate expressions, justifying each
step in the process.  No separate goal was developed for fractions, an area of difficulty for
Student as indicated by his KTEA II testing results.

62.    For Writing Applications, the PLOP records Student's KTEA II Written
Language score as 85; however, Student received a 65 on the Spelling subtest.  Student's
annual goal (by October 2009) was to proofread a paragraph for errors in spelling, grammar,
capitalization, and punctuation, measured by work samples and teacher-made tests,
maintaining 75% accuracy, implemented and measured by the special education teacher.
The writing goal listed three objectives or benchmarks, each being a measurable ability to
proofread a paragraph for errors in spelling with 60% accuracy by December 2008, 65%
accuracy by March 2009, and 70% accuracy by June 2009.

63.    The Transition to Adult Life plan identified the career-interest inventory to be
completed by Student, in the regular classroom, by September 2009.  The plan indicated that
Student would be attending community college within one year of exiting high school.  Two

---

[9] The PLOPs also list "auditory processing" disorder, contrary to Mr. Morgan's Psychoeducational
Summary Report.  This reference appears to be a typographical error, since the October 2008 IEP's minutes indicate
that the IEP team understood Student's discrepancy was caused by a visual, not auditory, processing disorder.

goals were set for Transition. The first was Self-Awareness, with the PLOP observing that Student wanted to be a stockbroker and followed the stock market. However, Student needed to gather information about potential careers for his transition portfolio. The stated goal for Self-Awareness was for Student to develop a transition portfolio, in the classroom, which would include personal information, personal strengths, career-interests, and resources for adult supports, measured by work samples and observation records, implemented by the special education teacher. The Self-Awareness goal had two measurable benchmarks: Student's portfolio would include personal information and personal strengths, by March 2009; and Student would use Career Cruising print-out information to identify five career interests, by June 2009.

64.    The IEP team was aware that Student could have difficulty in cold weather because of his CMT. Ms. Chapleau observed Student's attire and noted that Student does not regularly wear a jacket on cold days. She and other witnesses confirmed that Student did not ask for extra time to stay indoors to warm up, though given this option in his IEPs. This was a motivating reason for the October 2008 IEP team to develop Transition goals in self-awareness and self-advocacy. The second Transition goal was for Self-Advocacy of Student's need to regulate his temperature to address his CMT. The annual goal was for Student to request appropriate accommodations from the general education teacher with 95% accuracy, as measured by observation. The single benchmark was for Student to inform his physical education teacher when he was either too hot or too cold, or needed to be indoors, with 90% accuracy.[10]

65.    The IEP team reviewed an APE assessment report and agreed that Student would not be able to pass the physical fitness test because of the nature of Student's disability (CMT). The IEP team deemed Student exempt from the SB-601[11] requirement and the team agreed that the exemption was appropriately documented by Student's physician's note. Student's APE would be "dismissed" at the end of the 2008-09 school year, since it would no longer be a needed service.

66.    At the time of the triennial IEP, Student had 80 of the 230 credits needed to be eligible for a high school diploma. For graduation, Student would also need to complete the senior project, Algebra 1, and the California High School Exit Examination (CAHSEE), according to state standards.

67.    Ms. Chapleau recalled that the IEP team discussed after-school tutoring. Both special education and general education teachers were available to students, who merely needed to show up with work for tutoring. The tutoring schedule is available to students; the

---

[10] This benchmark actually read "special education teacher," but the goal and the class both state "general education teacher," which is correct for Student's physical education. The hearing officer will read an IEP as intended if the inadvertent use of the wrong word is obvious from the context.

[11] SB-601 is the Senate bill which requires the California Department of Education to conduct physical fitness testing and report the information to the Governor and Legislature. The law has specified exemptions, which the IEP team concluded Student fell within.

schedule is posted next to Ms. Chapleau's classroom door.  The tutoring was a recommendation, which was available to all students; the team did not add tutoring to the IEP as a designated service.

68.     The IEP team affirmed Student's need for SDC instruction, with 54% of his school day in special education.  Student's placement for academic classes was in a SDC and adaptive physical education (APE) was continued.  The IEP team agreed that Student should continue the placement with special academic instruction in math, English and science.  The team agreed that the Youth Employment Skills (YES) was an appropriate class for Student to take in the 2009-2010 school year.  Student, Mother, and Father approved and signed the IEP.

69.     The triennial IEP reconvened on November 7, 2008.  Attending were: Student; Mother; Father; District administrator, Matthew Anderson; general education teacher, Robyn Young; SDC teacher, Ms. Chapleau; assistive technology technician, Mr. Cook; and the District's school psychologist, Mr. Morgan.  The IEP team reconvened to address Student's assistive technology and PE goals and objectives, which were not fully addressed at the October 2008 meeting.  General education teacher Ms. Young attended because Student's PE teacher was ill and could not attend.

70.     The reconvened triennial IEP team adopted new motor skills developmental goal and objectives in PE.  The PLOP notes that Student did not display the ability to pass last year's goal of 20 cross-arm sit-ups in one minute.  The Student stated that the sit-ups were too painful for him to perform when being evaluated.  Therefore, the 20 cross-arm sit up goal would not be continued.  Since Student can perform 22 push-ups before exhaustion, the team agreed that improving this number would help build endurance and improve upper body strength.  The annual goal was for Student to perform 30 push-ups until exhaustion, as observed by teacher, maintaining three out of five trials over a period of 10 weeks.  The benchmark objectives, measured by teacher observation, were: 25 push-ups until exhaustion, over 10 weeks, by December 2008; 27 push-ups until exhaustion, over 10 weeks, by February 2009; and 28 push-ups until exhaustion, over 10 weeks, by May 2009.

71.     The IEP notes stated that Parent was interested in doing away with the AlphaSmart and implementing a different assistive technology device that would better help Student.  Mother testified that the IEP team was not receptive to her suggestions regarding AT, such as text-to-speech software which would enable Student to listen to text he would otherwise have difficulty reading.  Mother believed the software could be downloaded for free, but was told that the District does not download software.

72.     AT specialist Mr. Cook was unaware of Parents' desire to get rid of the AlphaSmart before this IEP.  At hearing, Mr. Cook could not recall the Parents' reasons why the AlphaSmart was not right for Student.  The IEP team addressed the AlphaSmart.  Mr. Cook emphasized that Student needed to be able to type.  Mr. Cook learned that Student was

17

not using the SpongeBob program to improve his typing skills[12] and Mr. Cook believed this contributed to Student's failure to make use of the AlphaSmart. Mother suggested speech recognition software, such as Dragon Speak. Mr. Cook thought the program would be too laborious for Student because it would take a long time for the software to learn Student's voice.

73.    The team discussed word prediction software, which Mother stated was her suggestion. Mr. Cook testified that there were many types of word prediction software, some powerful enough to predict or suggest contextual words. The IEP narrative refers to a WordsPlus (Words+) AT program as an example of such software which could help Student with typing reports.

74.    Mr. Cook did not conduct any AT assessment of the suitability of word prediction software for Student. The IEP indicated that Mr. Cook and Mother would arrange to meet at the Words+ store to review the various word prediction programs they offer. Mr. Cook wanted to take the family to Words+ to become familiar with how word prediction worked. The District did not have any devices with word prediction software.

75.    At hearing, Mother testified that she was frustrated with the District's AT approach. She states that the IEP document does not reflect her concerns about the AlphaSmart. She said that Student did not use the AlphaSmart because he could not read the screen because of his dyslexia. Mother testified that she told the IEP team that the family wanted to give the AlphaSmart back because Student was not using it. She also claimed that she did not receive the SpongeBob program as of the November 2008 reconvened triennial IEP meeting and that the family did not always have a computer to run the program. Yet, the IEP narrative stated that the IEP team discussed the need for Student to type. Neither the IEP nor any other witness indicated that Mother told the IEP team that Student did not have the SpongeBob program or that the family did not have a computer to use the program.

76.    At the IEP, Mr. Cook suggested that Student's insurance or other medical benefits might pay for word prediction software, which meant that Student could keep the software or device after high school. Mr. Cook testified that Words+ was experienced in getting insurance to pay for its devices. He never implied nor intended that the family should pay for such software or devices. Mother said she believed that if Student liked the Word+ word prediction program, the District would purchase it.

77.    The District's AT offer was the AlphaSmart and color overlays, with an understanding that Mother and assistive technology technician, Mr. Cook, would arrange to meet at Words+ to review the various programs they offer. Mother, Father, and Student approved and signed the IEP.

---

[12] Since first providing the SpongeBob typing program at the 2007 IEP, Mr. Cook stated he would periodically check with Student, who admitted he was not using the SpongeBob program.

18

78.    Mr. Cook testified that he misstated Words+ was a software program, at the reconvened triennial IEP.  He later discovered that Words+ sold specialized communication devices, with word prediction software (EZ Keys).  According to Mr. Cook, Word+ did not separately sell the software.

79.    Mother said Mr. Cook invited her to go to Words+.  She said she did not go because she found out insurance would not cover the program.  Mr. Cook confirmed that Mother declined, but could not recall why.  Mr. Cook took Student and his Father to the Words+ store, but not until September 2009.

*2008-2009 School Performance*

80.    A December 3, 2008 progress report showed that Student made: some progress toward his first reading objective; progress toward the first math objective, with a note that the goal should be continued; some progress toward meeting his first writing objective; insufficient progress to meet his career exploration transition goal; and some progress toward his first APE objective.

81.    A March 12, 2009 progress report stated that Student made: some progress toward his second reading objective; some progress toward his second math objective, with a note that the goal should be continued; some progress toward the second writing objective; some progress toward his second career exploration transition objective; some progress toward the second APE objective; and progress toward his only benchmark objective for his self-awareness, with the note that the goal should be continued.

82.    A May 20, 2009 progress report stated that Student made: some progress toward his third reading objective; progress toward his third math objective, with a note that the goal should be continued; some progress toward the third writing objective; some progress toward his second career exploration transition objective (this goal had only two benchmarks); and some progress toward the third APE objective.

83.    Student's spring 2009 STAR testing score in English was far below basic, in Biology was far below basic, and in Life Science was far below basic.  Student did not take the Math and World History components of the STAR for 2009.  Student's grades for the first and second semesters of his sophomore year were: D and D, in Algebra 1A; D and B, in Literature Support 2; D and C, in Life Science; A and A, in APE; C and C, in English; and A and A, in Student Aide.  The school did not notice any special IEP meetings during the remainder of the 2008-2009 school year, nor did Student's family.

84.    Student attended school at Eastside in the summer of 2009.  He received five credits for a class in math preparation for the California High School Exit Exam (CAHSEE).  He got a grade of A.

*The New Eastside High School Buildings and Campus*

85.     During the first two years of Student's attendance at Eastside, Student attended classes in temporary trailers while the District was constructing a new high school campus and buildings.  By the summer of 2009, the campus was almost complete.

86.     During summer school, Mother was able to drive Student through a delivery gate into a parking area, and drop Student off near a pedestrian gate.  The distance from the pedestrian gate to the classrooms was shorter than the distance from where students would typically enter the campus.

87.     Some of the new buildings had two floors.  The second floors were accessed by stairs or elevators.  The elevators required a key and were not for general use.  Eastside Security and some other District employees had elevator keys.  No student or non-employee had elevator keys.  The campus was also much larger and, depending on class schedules, students might have to walk greater distances than before, when classes were in temporary trailers.

88.     In the summer of 2009, Mother obtained and gave District a number of letters and notes from doctors, including Gonzalo G. Martinez, M.D., Yu-En Lee, M.D., and Saul M. Bernstein, M.D.  In a note[13] dated June 8, 2009, Dr. Martinez asked that Student be able to ride his "razor scooter" on campus because of his mobility problem.[14]  In a letter dated June 18, 2009, Dr. Bernstein wrote that Student's lower extremity weakness makes it extremely difficult for him to ambulate long distances.  Therefore, Dr. Bernstein recommended that Student be allowed to utilize his "razor scooter" for mobility from his vehicle to his classroom.  Dr. Bernstein also said that Student would benefit from using the elevators at school "as stairs can be difficult as well."  Finally, by a letter dated July 7, 2009, Dr. Lee similarly requested that Student be allowed to use his "razor scooter" from his vehicle to his classroom, as well as use the elevators, "since stairs can be difficult."  Dr. Lee said he was in agreement with Dr Bernstein.[15]  None of these doctor recommendations stated that Student could not use the stairs.

89.     When the new school year began in the fall of 2009, Mother could no longer drive through the delivery gate and drop Student off at the pedestrian gate.  Student was walking a greater distance to get to his first class.  Also, Student's sixth period class (as well as the student center and library) were on the second floor.  Generally, Student was walking greater distances to get to classes, as well as having to get to the second floor.

---

[13] This note is written as a prescription.

[14] Student and Parents refer to a "razor scooter" that is a narrow, metal, two-wheeled kick scooter, with an extension handle, resembling a small, two-wheeled skateboard with a steering arm.  The use of the term "razor scooter" resulted in a misunderstanding which contributed to disagreement between Parents and District.

[15] When given to the District, Dr. Lee's letter was not signed.  Mother testified that she recently had Dr. Lee sign the letter.

90.     Mother was very upset that she could no longer drop Student off at the pedestrian gate because the delivery gate was locked.  Mother and Student were displeased with the initial arrangement for Student to use the elevators, which was to call and wait for Security.

91.     Christopher Haymond is the Director of Security at Eastside High School.  He has worked for the District for eight years and has been Director for the past five years.  Previously, Mr. Haymond was a Los Angeles County Sheriff for 22 years.  Mr. Haymond demonstrated a keen awareness of the Eastside campus, the layout, the security measures utilized to maintain safety, and the demands upon and resources of the security staff.  Mr. Haymond appeared sincere throughout his testimony, giving direct and unambiguous answers.  He was a very credible witness.

92.     Mr. Haymond measured the distance from the pedestrian gate to Student's first period class, which was 275 feet.  He also measured the distance from where students would typically be dropped off, in front of the Temporary Office, to Student's first period class, which was 512 feet.  When Mother does not have access through the delivery gate to the pedestrian gate, Student must walk an additional 235 feet.

93.     When summer school began, Parents asked Mr. Haymond for a key to the delivery gate so they would have access to drive Student to the pedestrian gate for his first class.  Eastside campus is a closed campus.  The delivery gate is one of the perimeter gates to the school.  Mr. Haymond declined the request, determining that the issuance of keys to non-employees would be unsafe and compromise security.  Mr. Haymond also did not want non-employees driving in an otherwise restricted area where students may be walking.  Students in the school's Desert Wind classes and independent study classes enter through a walk-through gate, next to the delivery gate.  He acknowledged that the delivery gate was open during the summer of 2009 as part of the campus construction project.

*2009-2010 School Year*

94.     An IEP team met on September 1, 2009, for the stated purpose of addressing Student's mobility needs on the new Eastside campus.  Attending were: Student; Mother; Father; the Student's advocate, Claudia Petryshyn; Vice Principal A. Ritter; general education teacher, T. Estrada; District nurse, Olga Magana; special day class (SDC) teacher, Ms. Chapleau; program specialist, Johan Mekel; assistive technology technician, Mr. Cook; District school psychologist, Mr. Morgan; and Director of Security, Mr. Haymond.  Since this was not the annual IEP meeting, the goals and objectives from the prior annual IEP remained the same and were not addressed at this meeting.

95.     The IEP team addressed three issues regarding Student's mobility on the new Eastside campus: the long walk to Student's first class; elevator access to the second floor; and general mobility about the larger campus during the school day.

96.     Access through the delivery gate was discussed.  Mr. Haymond said that the Parents were asking for a key to the gate.  Mr. Haymond told them of the security and liability concerns of allowing non-employees access through the delivery gate.  Parents offered to sign a "waiver," but Mr. Haymond said that did not address his concern for student safety and would not protect the District from liability if a student were hurt.  Based on the conversation about the gate at the IEP meeting, Mr. Haymond believed the Parents intended on opening the gate themselves, which posed additional concern for safety and liability.  The gate had two swinging sides, each weighing 200 to 300 pounds.  Gates were locked and no one was posted at the gates.

97.     Program specialist Johan Mekel testified as the hearing.  He plans and develops programs, coordinates curriculum resources, assists teachers, provides training for District and SELPA, provides training on the new IEP program at District and SELPA, attends eighth grade transition IEP meetings, and attends IEP meetings which might require special attention related to resources.  Mr. Mekel has been the District program specialist for five years; all of his duties are within special education.  Mr. Mekel stated District wanted to use the special education bus to transport Student because the bus would drop Student off closer to his classroom and would also assist Student in being on time.  At the IEP, the Parents declined the offer, saying the busses do not have heaters.  Mr. Mekel had never received any complaints that the buses were too cold.

98.     The team discussed Student's use of his razor scooter on campus, which addressed both issues of getting to his first class and moving about the larger campus.  Mr. Haymond indicated that the razor scooter posed safety and liability issues.  The campus has 2,300 students and the risk of injury was too great.  The offer to sign a waiver did not answer these concerns.  Mr. Haymond testified that even if Student did ride his razor scooter on campus, he would have required Student to wear safety gear.

99.     The IEP team discussed the possibility of a Security golf cart transporting Student to his first class.  Mr. Haymond stated that Security could not guarantee a cart's availability.  Eastside has two carts and their primary purpose is to serve security needs for the large campus.  If a Security cart is available to give Student a ride on campus between classes, Security will do so.  However, a Security cart's availability cannot be guaranteed.

100.    Mr. Haymond testified that since the September IEP, he has seen Student on campus and offered to give him a ride on the Security cart.  Student accepted once out of about a dozen offers.  Mr. Haymond does not know why Student declined.[16]

101.    The IEP team discussed using a wheelchair, which could pick Student up at the office before school and transport him to his first period class; then at the end of the day, the wheelchair would pick him up and take him back to the front office.  Mother declined,

---

[16] The parties parried over the issue of Student's strength and stamina throughout the hearing.  Witnesses testified about seeing Student on his razor scooter and bicycle, riding to school or far from home.  This evidence and argument proved to be of little value in determining the merits of the parties' contentions, especially in light of Dr. Bernstein's testimony.

saying the doctor does not want Student to use a wheelchair at this time. Mother expressed concern about Student's mobility, especially to and from his first class. The IEP stated that the District would pursue other options.

102.    The IEP team discussed Student's access to the elevator, enabling him to go to his sixth period class on the second floor. Part of the school safety plan is that upstairs teachers have elevator keys; therefore, they would be responsible for getting Student downstairs. When Student needed to go upstairs, if a teacher with an elevator key was not available, Student could call Security. Mr. Haymond testified that this procedure was used for other students who may have needed to use the elevator. Mr. Haymond testified that Student's possession of an elevator key caused a number of safety concerns, including Student getting stuck in the elevator and other students getting into the elevator, where they would be unsupervised. The elevators were not equipped with cameras, though there were emergency buttons and speakers. District could not assure an elevator key's proper use when operated by a non-employee. The District would not provide Student with an elevator key.

103.    Mother and Student testified that Student would often have to wait a long time for Security to come, causing Student to be late for class. Mother testified that Student would therefore take the stairs when he should not be using stairs. Mr. Mekel testified that using Security had caused Student to wait at times, but not for 30 or 50 minutes. Mr. Mekel agreed that providing an elevator key to Student for unsupervised use of the elevator posed a safety concern.

104.    Though the primary purpose of the September IEP meeting was to address Student's mobility, the assistive technology technician, Mr. Cook, was present. The IEP team discussed Student's AT. The IEP noted that Student and Parents needed to meet with the District AT technician and a Words+ representative. The IEP reads "Words Plus would be used for home use and has word prediction software built in." Various downloadable programs were discussed that would be free for Student to use. Student's advocate recommended text-to-speech software to use in his SDC classes.

105.    The IEP stated that the SpongeBob software would be ordered for Student. According to Mr. Cook, this was the first he heard that Student claimed not to have the SpongeBob software; Mr. Cook maintained that he gave the SpongeBob program to the family at the September 2007 IEP meeting. Since Mr. Cook did not have any SpongeBob programs available, he had to order another copy.

106.    Mr. Cook told Student and Parents that he was obtaining hardware, called a Fusion. The IEP read that the Fusion was a dictation device. In his testimony, Mr. Cook states that the Fusion is not a dictation device but is a word processor. Mr. Cook brought a Fusion to the hearing. The Fusion is a keyboard with a screen. Though it resembles the AlphaSmart, the Fusion has a larger screen, and is slightly bigger and heavier. The Fusion's software storage of files is streamlined and better structured than that of the AlphaSmart. The primary difference was the Fusion's software capabilities. The Fusion had text-to-speech capability, word prediction software, spelling and vocabulary, adjustable font size, a

23

math component and, significantly, built-in keyboarding (typing) instruction. To print, the Fusion needed to connect to a computer or the document could be downloaded to a flash drive. Mr. Cook testified that classrooms have computers, which Student could use for printing. The Fusion had a rechargeable battery (AlphaSmart did not), cannot be overcharged, and came from a California company which offered great technical support for Student, Parents or Mr. Cook, if there was any problem. When Mr. Cook was first introduced to the Fusion, he testified that he first thought of Student.

107.    Mr. Cook testified that the IEP stated that Student would be provided with the Fusion on a trial basis because Student did not use the AlphaSmart. Mr. Cook wanted to encourage Student to use the Fusion, which he believed met Student's needs. Mr. Cook did not do a formal AT assessment of Student. He had used the 2006 AT assessment, which he did not update. Mr. Cook ordered the Fusion for Student the day of the IEP, September 1, 2009. At hearing, Mr. Cook testified that he was unaware of how CMT affected Student's strength. Mr. Cook did not consider how Student's CMT might affect Student's ability to use his AT.

108.    The IEP team discussed color overlays and agreed to order blue and purple. Student, Mother, Father, and Student's advocate approved and signed the IEP.

109.    Within a couple of weeks of the September 1, 2009 IEP, Mr. Cook took Student and Father to Words+ to see the word prediction software on the Words+ devices. Mr. Cook testified that he wanted Student to see for himself what the word prediction software could do for him. Student seemed excited about the software. Mr. Cook never told Student or Parents that the District was purchasing a Word+ device. Mr. Cook had already ordered the Fusion, which had word prediction software.

110.    An annual IEP team meeting was held on October 8, 2009. Attending were: Student; Mother; Father; Student's advocate, Claudia Petryshyn; District administrator, Aaron Ritter; general education teacher, Tizoc Estrada; District nurse, Olga Magana; SDC teacher, Ms. Chapleau; SDC teacher, Ronald Coleman; SDC teacher, Brandy Levy; SDC teacher, Tenicia Takamatsu; District program specialist, Mr. Mekel; Eastside counselor, Melody Briseño; itinerant orthopedic impairment teacher, Peter Clarkson; and assistive technology technician, Mr. Cook.

111.    This IEP was the first IEP for which Ms. Chapleau took notes on a new computer program. She had problems documenting all the discussions and, specifically, making sure that all the information was on the correct page and properly filled out.

112.    The IEP team reviewed a Report of Itinerant Teacher Orthopedic Impairment (ITOI) completed by Peter Clarkson, ITOI. The ITOI observed and evaluated Student's motor difficulties, relative to writing and walking around the campus, for the purpose of making recommendations for Student's IEP. Mr. Clarkson observed Student writing and reviewed his written work. Though he was able to get his written work done within reasonable time limits, typing assignments on his portable word processor would make his

24

work easier to read. The ITOI recommended that Student utilize his typing tutorial program and practice his typing skills for at least half an hour per day. However, Student said he was usually too tired when he gets home. Therefore, the ITOI recommended a typing goal as part of his English/language arts.

113.    The ITOI noted that Student had difficulty walking about the campus, covering the distances from class to class, often causing him to be late. The ITOI walked with Student about campus and observed his gate and stamina. Student was often tired when he went home after school and would nap. If he does not take a nap, he would go to bed at about eight o'clock. When asked about how he gets his homework done, Student said that he does not ever have any, so homework is not a problem. The ITOI said that the District believed the family's suggestion that Student be able to use his razor would be unsafe in the very crowded school passageways. However, the ITOI proposed a solution. The ITOI believed that Student would greatly benefit from using a 3-wheeled "power scooter" with a rechargeable battery. He said that the devices are very compact, easy to maneuver, easily fit between classroom doors, and easy to park in most classrooms. Per Mr. Mekel's testimony, Mr. Clarkson showed pictures of the contemplated electronic power scooter to Parents. The Scooter was a Buzzaround Lite Series XR. (Pictures and specifications of the scooter were introduced as evidence at the hearing.)

114.    Student would qualify for funding if his secondary eligibility was changed from OHI to OI, or severe orthopedic impairment, which is defined as "an orthopedic impairment that adversely affects the student's educational progress." This would be considered a "low-incidence disability" and would qualify Student to receive low-incidence funds. With the energy Student would save by using the scooter to move about the campus, Student would be more likely to practice his typing, four to five days a week, for at least a half hour. Accordingly, the ITOI recommended and drafted two goals. The first goal was for personal qualities in the area of vocational skills, with the Student demonstrating personal promptness for future employment by being in the classroom before the bell rings, given his use of the power mobility device. The second goal was for English and Language Arts, with the Student using the word processor and typing tutor program, 30 minutes each weekday.

115.    The IEP team followed the ITOI's recommendation and changed Student's secondary eligibility of OHI to OI. Since the scooter was not immediately available, the District offered a wheelchair to pick Student up before school in the office and transport him to his first class; similarly, Student would be transported back to the office at the end of the day. Mother did not want a wheelchair; she wanted a Security golf cart and aide to transport Student. Though the District could provide the aide, it could not guarantee a cart since the two Eastside carts must be available for security needs. Despite the Parents' resistance, the District purchased the three-wheeled, electronic power scooter.

116.    The IEP's Individual Transition Plan noted that Student attended the meeting and participated in the transition discussions. Student indicated that he wanted to attend college, take classes in finance and, eventually, become a stockbroker. After high school, Student intended to live on his own. Student attended the Youth Employment Skills (YES)

25

class, which assisted Student in preparing for employment. Also, Student could meet with the school transition specialist, outside of the YES class, to discuss possible job opportunities and touring local community colleges.

117.    The YES teacher, Brandy Levy, attended the IEP and reported that Student improved since the beginning of the semester. Student completed just about everything that he was missing. Student's testing average had been about a C.

118.    Ms. Levy testified at the hearing. She is a resource teacher with a special education credential and four years of experience. Previously, she was a long-term special education substitute teacher; and before that she was an instructional aide. Ms. Levy attends all the IEP meetings for students on her caseload. Student is not on her caseload, but she attended Student's October 8, 2010 annual IEP meeting. Ms. Levy was somewhat nervous during her testimony, but demonstrated an intimate knowledge of her class materials and goals.

119.    The YES class enables students to have success in the work setting. YES partners with businesses and organizations to give students opportunities to experience real world work environments and to explore a wide variety of potential careers. Student's case manager, who also attended the IEP meeting, prepared the recommended Transition Plan. The District transition specialist is not required to attend all IEP meetings.

120.    Student attends Ms. Levy's sixth period YES class, which has 16 students. Student is assembling a career portfolio, which included employment-related documents like cover letters, resumes, thank you letters, banking letters, recommendation letters, job applications, fact sheets, interview techniques, and Dress for Success guidelines. The other students received similar portfolio assignments, but Student completed the assignments based upon his interests and strengths. All of the portfolio assignments were tailored to Student because all assignments were completed with Student's unique input. The annual goal for Transition-Employment referred to the assignments associated with the career portfolio. A key component of the portfolio and the YES class are questionnaires and surveys which assist the students in developing five- and ten-year career plans. Ms. Levy will personally review these plans with each student. Ms. Levy said that the activities do not have to be completed within the classroom. At the time of her testimony, seven weeks remained in the school year. Student's portfolio was not complete and further field trips were planned.

121.    By the date of the hearing, Ms. Levy's YES class had taken the following field trips: Salute to Youth in September; Antelope Valley (AV) Mall Community Classroom in December and February (each is a two-day field trip); and North Valley Occupational Center in March. Salute to Youth was a half-day event, which included vocational programs, colleges, trade and vocational schools. Vocational opportunities featured at Salute to Youth included aerospace, business, student/family science, healthcare, information technology, law, and government public services. Representatives discussed transitioning pathways out of high school to various careers. The AV Mall Community Class was a two-day learning

26

workshop for on-the-job training and work ethics in Mall stores.  A student must maintain a 2.0 grade point average (GPA), with good behavior and attendance, as conditions to attending the workshop.  Student did not attend the first workshop because his December grades were low and Student told Ms. Levy that he could not afford to miss school.  Student did not attend the first day of the second AV Mall workshop in February but attended the second day because he was sufficiently caught up with his school work.  North Valley Occupational Center (NVOC) offers classes in different trades and occupations.  NVOC focuses on post secondary vocational opportunities.  Any student could enroll in the NVOC programs.

122.    The YES class invited speakers from various fields, which expose students to different careers, including job requirements and education prerequisites.  Unlike working with the Internet or using a book, the students could question the speakers about particular areas of interest.  The YES class also used videos about job search attitude, managing money (*Your Life, Your Money*), and interview techniques (*Rock This Interview*).  Ms. Levy gave an assignment associated with each video.  Student was present for each video.

123.    Student qualified as a client of the Department of Rehabilitation (DOR).  The transition specialist sent the paperwork to Parents.  At the IEP, Mother said she wanted to delay filing the paperwork until Student turned 18 years of age, which he did on February 16, 2010.  Student testified, however, that he completed the DOR paperwork on October 14, 2009.[17]  The DOR would help Student achieve career goals and access services for transition, based on Student's interests and preferences.  For example, if Student wanted to be a graphic designer, the DOR would assist in finding a post-secondary program and pay for the services.  Ms. Levy said she believed that Student received educational benefit from the YES class.[18]

124.    The YES class was on the second floor.  Ms. Levy knew that Student was recommended to use the elevator; she has never been told that Student had to use the elevator.  At the beginning of the 2009-2010 school year, Student told Ms. Levy that Security would come with a key and take him down the elevator when he completed her class.  This is consistent with the September 2009 IEP.  Ms. Levy became aware that this did not always work well.  So, at the end of September or very early October, Security provided her with an elevator key so she could take Student down the elevator.  Her duties in this regard were discussed by the October 2009 IEP team.

125.    Tenicia Takamatsu is Student's fifth period SDC English teacher.  She attended the October 9, 2009 IEP meeting, and testified at the hearing.  The 2009-2010 school year was her first year as a SDC teacher.  She possesses a preliminary bachelor's

---

[17] In fact, Student testified that he had a job at GameStop because of the DOR's vocational services.

[18] Ms. Levy (and other witnesses) also testified about Student missing a YES class in November 2009 when her aide Ms. Parsons found Student on a landing in the stairwell with another student.  Student gave conflicting reasons for his being in the stairwell.  Both parties overstated the relevance of this incident and the ALJ discounted its evidentiary significance.

degree in English and an intern degree in special education.  Nineteen students attend her fifth period class.  At the beginning of the school year, Student would wait for Security to come and take him up the elevator to his sixth period class on the second floor.  Then, Security provided a key to Ms. Takamatsu so she could take Student up the elevator without waiting for Security.

126.    The 2009 annual IEP team reviewed the status of assistive technology.  Mr. Cook reported that the Fusion device had been ordered and District was awaiting delivery.  Mr. Cook stated that Student, Father, and he met at the Words+ store.  Mr. Cook testified that he wanted Student to see what word prediction software could do, since it was a major feature of the Fusion.  Mr. Cook said that Student seemed quite excited about the word prediction.  The IEP's AT report also stated that other word prediction software would be ordered which Student could use at home.  Mr. Cook reported that the SpongeBob typing program, which the September IEP indicated would be ordered, was received by Mr. Cook and delivered to Parents at home.  Mother confirmed receipt of the program in her testimony.  Mr. Mekel testified that the overlays referred to in the September 2009 IEP had been ordered, received and distributed to Student, Student's case manager, Mr. Cook, and Student's teachers.

127.    In addition to the ITOI's two goals and the transition goals, the 2009 annual IEP team set goals and objectives in algebra, written language, and reading.  For the reading goal, Student's PLOP (referred to as "baseline" in the new IEP program) was that Student could comprehend passages read and answer a variety of questions related to the reading.  Student's reading goal was for Student to identify/analyze recurring themes across works (e.g. bravery, loyalty, friendship) as measured by work samples maintaining with 70% accuracy for four out of five trials.

128.    For Written Language, the baseline was that Student could write simple paragraphs.  The annual goal was: given a written/verbal prompt, Student would choose the form of writing that best suits the intended purpose (e.g. personal letter, letter to the editor, review, poem, report, narrative) as measured by work samples, maintaining with less than three errors per essay.  The writing goal listed three measurable short-term objectives toward the annual goal.

129.    For algebra, the baseline was that Student could solve equations with an unknown variable and could also add, subtract, and multiply monomials and polynomials.  The annual goal was, given core curriculum materials, Student would add, subtract, multiply, and divide monomials and polynomials, by correctly factoring and reducing equations to lowest terms, as measured by work samples, maintaining 70% accuracy for four out of five trials.  The algebra goal listed three measurable short-term objectives toward the annual goal.

130.    The 2009 IEP listed accommodations to be afforded Student, which included note-taking support, use of a visual place holder, and access to a computer on campus.  Organizational support was identified as preferential/assigned seating.  Instructional strategies included repeating/rephrasing instruction, checking for understanding, and extra

28

time to complete assignments.  Strategies related to test situations included a small-group setting and extra time as needed.  The IEP also identified the accommodations to be afforded Student for the 11th grade STAR testing in English Language Arts (ELA), Math, Science, History/Social Science, and Writing, as well as the CAHSEE.

131.    Student, Mother, Father and their advocate signed the IEP.  However, Mother and Father indicated they agreed with the IEP except in the "area of mobility.  I would like [Student] to use his Razor scooter to and from parking lot.  As per medical advice."

132.    Another IEP was held on October 22, 2009, so the team could again discuss mobility issues for Student.  The Student was invited to attend, but declined.  Attending were:  Mother; Father; Student's advocate, Claudia Petryshyn; District administrator, Aaron Ritter; SDC teacher, Ms. Chapleau; and District program specialist, Mr. Mekel.

133.    The District offered to provide an aide and wheelchair to assist Student to his first class, with return service at the end of day.  Mother again asked for a Security cart and aide.  Mother said the wheelchair was against medical advice.  The IEP narrative stated that Security had helped with transporting Student to his first period class but, because the Security carts are not always available, they were not a viable service option.

134.    The IEP stated that the Parents also refused an electric power scooter, which Student could use to get to his first period class and around campus and return from his sixth period class back to the front office.  Parents said that this option was declined for psychological reasons because it is against medical advice.  Parents requested that Student be able to use his "razor scooter" as his mobility device.  The District declined this option because a "razor scooter" was not an approved mobility device to assist individuals with mobility issues.

135.    The IEP team discussed Student riding the bus and/or a shortened day in independent study.  However, Parents said the bus was unsafe because of the stair and the temperature may not be controlled to provide heat during the winter months.  Also, Mr. Mekel testified that the team did not believe a shortened day with independent study would be appropriate because he required direct support for math.  Since independent study was the first period, Student's math class would have to be moved and Student would not be able to take his general education Advanced Guitar class.  The team did not want Student to miss his guitar class.

136.    The IEP team said the question of the delivery gate drop-off would be further investigated.  However, District witnesses testified that further inquiries only confirmed the prior determination that the delivery gate needed to remain locked and that non-employees could not possess keys, for security and liability reasons.

137.    Parents requested that an evacuation plan be developed for Student and, also, that one person needed to be in charge of getting students up and down the elevator, such as an assigned aide.

29

138.   Mother, Father, Student's advocate and the remainder of the attendees signed the IEP.  Mother agreed, with the following exception: "I consent to the implementation of the IEP but I do not agree that it provides F.A.P.E."

*The Issue of Mobility on Campus*

139.   Eastside Vice Principal Aaron Ritter testified at the hearing.  Mr. Ritter attends IEP meetings as the District designee who knows about the available school and District program services.  Mr. Ritter also assures that IEPs comply with state and federal law.  Mr. Ritter testified that there were two IEP meetings called to address Student's mobility issues in the fall of 2009, which were in addition to the October 2009 annual IEP meeting.  Parents never had any disagreement with the educational services.  Parents signed and agreed to the goals, placement, and services.  In these three IEPs, the Parents' primary concern was mobility.  Mr. Ritter said that Mother specifically asked for a key to the delivery gate.  Mr. Ritter said that the option of the delivery gate was further explored with Security and the Eastside principal.  The District determined that the delivery gate was not an option because of security, safety, and liability issues.  Gates remain locked except to employees with keys.  The District must maintain security of the closed Eastside campus.  There had been incidents when the Eastside campus had a security lockdown; the campus remained lockdowned until deemed safe by law enforcement.  All gates to the outside were secured in such situations.  Security would be compromised if any non-employee had keys to a locked gate.

140.   Like Director of Security Mr. Haymond, Mr. Ritter observed Student decline rides on the Security cart, when offered.  He and Mr. Haymond did not know why Student declined the rides.  Student testified that he did not want to attract attention to himself.  In questioning District personnel during the hearing, Student's counsel suggested that Student might decline rides on the car because it may be physically difficult.  Not only is this contrary to Student's testimony, it conflicts with Mother's continuing request that a Security cart take Student to his first class.

141.   Mr. Mekel testified that he informed Mother in a January 22, 2010 telephone conversation that the Buzzaround Lite portable scooter had arrived and was available for Student's use at Eastside High School.  Mr. Mekel memorialized the conversation in a January 25, 2010 letter, saying that Mother did not want to "do that" to Student and make him use the scooter.  She also told Mr. Mekel that she had spoken to Student's doctor and the doctor stated that Student is doing as well as can be expected.  Mr. Mekel offered to demonstrate the use of the scooter to both Student and her, further explaining how it can address Student's mobility issues.  Mother declined the offer.  Mr. Mekel gave Mother his phone number, should she change her mind.

142.   As of the time of his testimony during the hearing, Mr. Mekel had not heard back from Mother or Student about using the scooter.

30

*Student's Expert, Saul Bernstein, M.D.*

143.    Saul Bernstein, M.D. (Dr. Bernstein) testified at the hearing.  The doctor has been a pediatric orthopedic specialist since 1970.  He obtained his medical degree from the University of California, San Francisco, in 1963; his post-graduate degree was from University of Southern California School of Medicine.  Thereafter, he did a fellowship in England in neurological pediatric orthopedics.  He is the clinical professor of orthopedic surgery at the USC School of Medicine, where he has taught since 1968.  He belongs to the American Academy of Orthopedic Surgery and the Pediatric Orthopedic Association.  He has made numerous presentations and authored many academic articles.  Dr. Bernstein had been treating members of Student's family for many years.  He first saw Student in 1996 and has since seen him every four to six months.  Dr. Bernstein possesses the education, experience and qualifications to provide testimony as an expert regarding Student's CMT. Dr. Bernstein was clear and direct in responding to counsels' questions.  Dr. Bernstein was very credible, demonstrating an admirable knowledge of his specialty and insightful understanding of Student's CMT.  In light of the above, Doctor Bernstein's testimony was given great weight.

144.    Dr. Bernstein confirmed that Student has CMT; the doctor has watched it develop in Student.  CMT is a neurological condition where there is an abnormality of nerve conduction between the brain and the muscles.  There are different types of CMT, which is a gradually progressive disease.  CMT does not affect mental capacity nor does it usually shorten lifespan.  As a patient ages, the muscles become weaker.  Dr. Bernstein emphasized that the disease is variable, affecting patients differently, some severe and some not so severe.

145.    CMT affects a patient's legs progressively, often with drop-foot, which requires braces.  Since there is a lot of soft tissue loss, the bones are prominent.  The bones are not as stressed and may become weaker.  Patients do not have good feeling in their legs and feet.  They might be more likely to trip and would require braces to keep their feet up, decreasing the likelihood of tripping.  CMT may affect the arms, but it varies amongst patients.

146.    Student might be more likely to get cold, especially in the extremities because of the muscle-wasting.  Dr. Bernstein continued to emphasize that CMT is variable, even among members of the same family, and that only Student can measure his strength and stamina to walk, climb, or carry.  When shown an AFO brace, Dr. Bernstein confirmed it as Student's.

147.    Dr. Bernstein said that Student has a short fibula because the fibula shortens without muscle contraction, which causes some instability at the ankle.  Yet, like anyone else, walking is good exercise for Student.  Dr. Bernstein says that a wheelchair or other mobility device should only be used when necessary.  For the most part, it is better to be up and moving.  However, with longer distances or fatigue, use of a mobility device is appropriate.

31

148.   Dr. Bernstein advised Student not to take stairs because it takes a lot of energy to get his foot in place. If he missed, Student risked falling. However, Dr. Bernstein stated that it is up to Student to determine whether he can tolerate going up or down stairs. Dr. Bernstein does not know how far Student can walk or how many stairs Student can climb. Dr. Bernstein cannot testify that Student cannot take the stairs. Ultimately, Student is the one to determine what he can or cannot do. Similarly, Student is the one who decides what weight he can carry in his backpack.

149.   Dr. Bernstein confirmed that he wrote a June 18, 2009 letter regarding Student's mobility on the Eastside campus, probably at Parents' request. He reviewed the letter. The doctor did not say Student could not take the stairs but only that the stairs could be difficult and Student would benefit from using the elevators.

150.   The doctor also confirmed that Student should be allowed to utilize his "razor scooter" for mobility from his vehicle to his classroom. However, the testimony soon made clear that Dr. Bernstein meant something significantly different, from Student, when referring to a "razor scooter." (See footnote 14.)

151.   When using the term "razor scooter," Doctor Bernstein meant a three-wheeled motorized scooter, with hand controls. When shown the picture of the Buzzaround Lite scooter purchased by the District, Dr. Bernstein identified it as the mobility device he meant when he used the term "razor scooter." In other words, the District purchased exactly what the Student's doctor had recommended. Dr. Bernstein said that Student could utilize the motorized scooter for long distances or "off days." He did not consider the motorized scooter to be a motorized wheelchair.

152.   Dr. Bernstein confirmed that he did not talk to anyone at the District. Since his letter included an invitation to contact him if there were any questions, he would not have had any privacy concerns if the District called him.

*The Fusion and Assistive Technology*

153.   On January 11, 2010, Mr. Cook gave Student the Fusion device, which District ordered in September 2010. Student would not accept the headphones, which Mr. Cook provided with the Fusion because Student said he did not want to stand out. Using the headphones muted the Fusion speaker. Sound was necessary to take advantage of the Fusion text-to-speech feature.

154.   Before giving the Fusion to Student, Mr. Cook trained himself on the device. Mr. Cook then trained Student on the device when delivered. Mr. Cook did not train Parent because Parent declined.

155.   Student testified that the Fusion weighs too much for him to carry in his backpack. Student and his counsel demonstrated the Fusion device at hearing. The Fusion screen is various shades of gray (like a large calculator screen), approximately three by seven

inches, and not very bright. Student pointed to the screen's reflection, stating that the reflection causes the words to move around on the screen.

156.    Student claimed that if he needed something printed, he would have to go upstairs. He also stated that he used the Fusion in his English class. Student's fifth period English teacher, Ms. Takamatsu, maintained a log of Student's Fusion usage. Between January 19 and March 12, 2010, there were 19 days when Student was present and had an activity for which he could use the Fusion. Student did not use the Fusion once; on two occasions, Ms. Takamatsu asked Student to use the Fusion and he refused. (Similar logs in other classes reported similar results.) Ms. Takamatsu stated that her class has eight desk computers that the students use for their final drafts.

157.    Student stated that he did not type very well. If he had a computer at home, he could make use of a typing program, like SpongeBob. He could also use the software that helps him write, apparently referring to the word prediction software. Student testified that if computers were in classrooms, he would not need the Fusion. If he had a computer and the software at home, he would not need the Fusion. Using the classroom computers meant that he did not have to carry the Fusion around. Student's testimony indicated he would much rather be working with a notebook computer than the Fusion. However, a notebook computer would be substantively heavier than a Fusion. Also, Mr. Cook testified that a computer has other distractions, such as the Internet and social programs, which would be very distracting for Student.

158.    At the time of the hearing, Student was not using the Fusion.

*2009-2010 School Performance*

159.    Student's grades for the first semester of his junior year were: D in Algebra 1B; D in U.S. History; A in YES Class; B in CAHSEE Prep Math; C in English; and C in Advanced Guitar. Student's February 2010 Third Quarter Progress Report reported: A in Algebra 1B; A- in U.S. History; A in YES Class; A in CAHSEE Prep Math; A in English; and B in Advanced Guitar.

LEGAL CONCLUSIONS

*Burden of Proof*

1.    In a special education administrative due process hearing, the party seeking relief has the burden of proving the essential elements of its claim. (*Schaffer v. Weast* (2005)

546 U.S. 49, 56-62 [126 S.Ct. 528, 163 L.Ed.2d 387].)  In this matter, the Student has the burden of proof.[19]

   2.      Under the Individuals with Disability Education Act (IDEA) and state law, children with disabilities have the right to a FAPE.  (20 U.S.C. § 1400(a); 34 C.F.R. § 300.101 (2006); Ed. Code, § 56000.)  A FAPE means special education and related services that are available to the special needs pupil at no charge to the parents, that meet state educational standards, and that conform to the child's IEP.  (20 U.S.C. § 1401(a)(9); 34 C.F.R. § 300.17 (2006); Cal. Code Regs., tit. 5, § 3001, subd. (p).)  "Special education" is instruction specially designed to meet the unique needs of a child with a disability.  (20 U.S.C. § 1401(a)(29); 34 C.F.R. § 300.39 (2006); Ed. Code, § 56031, subd. (a).)  "Related services" are developmental, corrective and support services that are required to assist a special needs pupil to benefit from special education.  (20 U.S.C. § 1401(a)(26); 34 C.F.R. § 300.34(a) (2006); Ed. Code, § 56363, subd. (a).)  In California, related services are called designated instruction and services (DIS), which must be provided if they may be required to assist the child in benefiting from special education.  (Ed. Code, § 56363, subd. (a).)  Related services include transportation, developmental, corrective and supportive services as may be required to assist the pupil in benefiting from special education.  (20 U.S.C. § 1401(26); Ed. Code, § 56363, subds. (a).)  Specially designed instruction also includes accommodations that address a child's unique needs and that ensure access to the general curriculum.  (34 C.F.R. § 300.39(b)(3) (2006).)

   3.      In *Board of Education of the Hendrick Hudson Central School District v. Rowley* (1982) 458 U.S. 176, 201 [102 S.Ct. 3034, 73 L.ED.2d 690] (*Rowley*), the United States Supreme Court addressed the level of instruction and services that must be provided to a pupil with a disability to satisfy the requirements of the IDEA.  The Court determined that a student's IEP must be reasonably calculated to provide the student with some educational benefit, but that the IDEA does not require school districts to provide the student with the best education available or to provide instruction or services that maximize a student's abilities.  (*Id.* at pp. 198-200.)  The Court stated that school districts are required to provide a "basic floor of opportunity" that consists of access to specialized instructional and related services that are individually designed to provide educational benefit to the student.  (*Id.* at p. 201; *J.L. v. Mercer Island School District* (9th Cir. 2009) 575 F.3d 1025, 1034,1037-1038 & fn. 10 (*Mercer Island*).)

   4.      There is no one test for measuring the adequacy of educational benefits conferred under an IEP.  (*Rowley, supra,* 458 U.S. at pp. 202, 203 fn. 25.)  A student may derive educational benefit under *Rowley* if some of his goals and objectives are not fully met, or if he makes no progress toward some of them, as long as he makes progress toward others.

---

[19] Other than Dr. Bernstein, Student did not present any expert testimony.  Student did not introduce any independent assessment or evaluation.  Student's contention of a FAPE inadequacy was based on cross-examination of District personnel and exhaustive dissection of the documentary evidence.  Without contravening evidence, this ALJ's factual findings are primarily based upon witnesses' credibility and appraisal of documents.  Argument is seldom a sufficient substitute for evidence.  Without affirmative evidence to the contrary, Student's contentions were more difficult to establish.

A student's failure to perform at grade level is not necessarily indicative of a denial of a FAPE, as long as the student is making progress commensurate with his abilities. (*Walczak v. Florida Union Free School District* (2nd Cir. 1998) 142 F.3d 119, 130; *E.S. v. Independent School Dist., No. 196* (8th Cir. 1998) 135 F.3d 566, 569; *In re Conklin* (4th Cir. 1991) 946 F.2d 306, 313; *El Paso Indep. School Dist. v. Robert W.* (W.D.Tex. 1995) 898 F.Supp.442, 449-450.)

     5.     The factual showing required to establish under *Rowley* that a student has received some educational benefit is not demanding. For a student in a mainstream class, "the attainment of passing grades and regular advancement from grade to grade are generally accepted indicators of satisfactory progress." (*Walczak v. Florida Union Free Sch. Dist., supra,* 142 F.3d at p. 130.) A district need not guarantee that a student will make a month's academic progress in a month's instruction; a student may benefit even though his progress is far less than one grade level in one school year. (See, e.g., *Houston Indep. Sch. Dist. v. Bobby R., supra,* 200 F.3d at p. 349 n.3.) A two-month gain in reading in 10 instructional months has been held an adequate showing. (*Delaware Valley Sch. Dist. v. Daniel G.* (Pa. Cmwlth. 2002) 800 A.2d 989, 993-94.) A student derives benefit under *Rowley* when he improves in some areas even though he fails to improve in others. (See, e.g., *Fort Zumwalt Sch. Dist. v. Clynes* (8th Cir. 1997) 119 F.3d 607, 613; *Carlisle Area School v. Scott P, supra,* 62 F.3d at p. 530.) He may derive benefit while passing in four courses and flunking in two. (*Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.* (S.D.Tex. 1995) 931 F.Supp. 474, 481.) A showing of progress does not require that a "D student" become a "C student" and thus rise in relation to his peers.

     6.     Progress may be found even when a student's scores remain severely depressed in terms of percentile ranking and age equivalence, as long as some progress toward some goals can be shown. (*Coale v. Delaware Dept. of Educ.* (D.Del. 2001) 162 F.Supp.2d 316, 328.) Whether a student has received more than de minimis benefit must be measured in relation to the student's potential. (*Mrs. B. v. Milford Bd. of Educ.* (2d Cir. 1997) 103 F.3d 1114, 1121; *Polk v. Central Susquehanna Intermediate Unit 16* (3d Cir. 1988) 853 F.2d 171, 185.) As the Supreme Court has said: It is clear that the benefits obtainable by children at one end of the spectrum will differ dramatically from those obtainable by children at the other end, with infinite variations in between. One child may have little difficulty competing successfully in an academic setting with non-handicapped children while another child may encounter great difficulty in acquiring even the most basic of self-maintenance skills.

     7.     In resolving the question of whether a school district has offered a FAPE, the focus is on the adequacy of the school district's proposed program. (See *Gregory K. v. Longview School District* (9th Cir. 1987) 811 F.2d 1307, 1314 (*Gregory K*).) A school district is not required to place a student in a program preferred by a parent, even if that program will result in greater educational benefit to the student. (*Ibid.*) Nor must an IEP conform to a parent's wishes in order to be sufficient or appropriate. (*Shaw v. Dist. of Columbia* (D.D.C. 2002) 238 F.Supp.2d 127, 139.) For a school district's offer of special education services to a disabled pupil to constitute a FAPE under the IDEA, a school

district's offer of educational services and placement must be designed to meet the student's unique needs and be reasonably calculated to provide some educational benefit in the least restrictive environment. (*Ibid.*)

8.      To determine whether a pupil was denied a FAPE, an IEP must be examined in terms of what was objectively reasonable at the time it was developed, not in hindsight. (*Adams, supra,* at p. 1149; *Roland M. v. Concord Sch. Comm.* (1st Cir. 1990) 910 F.2d 983, 992 (*Roland*).)  Minor implementation failures are not actionable given that "special education and related services" need only be provided "in conformity with" the IEP.  There is no statutory requirement of perfect adherence to the IEP, nor any reason rooted in the statutory text to view minor implementation failures as denials of a free and appropriate public education. (*Van Duyn, supra,* 502 F.3d 811, 821.)  A "material" failure to implement, though, is actionable.  A failure is material "when there is more than a minor discrepancy between the service a school provides to a disabled child and the service required by the child's IEP." (*Id,* at p. 822.)  The materiality standard does not require that the child suffer demonstrable educational harm in order to prevail. (*Ibid.*)

*Issues 1a, 2a, 3a, Failure to Assess in All Areas of Suspected Disability*

9.      Student contends that he was denied a FAPE from February 11, 2008, through the filing of his due process hearing request because the District failed to assess him in all areas of suspected disability.  District contends that it assessed Student is all areas of suspected disability.

10.      A school district is required to use the necessary assessment tools to gather relevant functional and developmental information about the child to assist in determining the content of the child's IEP.  (34 C.F.R. § 300.304(b)(1)(ii).)  A school district is also required to ensure that the evaluation is sufficiently comprehensive to identify all of the child's needs for special education and related services.  (34 C.F.R. § 300.304(c)(6).)  The personnel who assess the student shall prepare a written report that shall include, without limitation, the following: 1) whether the student may need special education and related services; 2) the basis for making that determination; 3) the relevant behavior noted during observation of the student in an appropriate setting; 4) the relationship of that behavior to the student's academic and social functioning; 5) the educationally relevant health, developmental and medical findings, if any; 6) if appropriate, a determination of the effects of environmental, cultural, or economic disadvantages; and 7) consistent with superintendent guidelines for low-incidence disabilities (those affecting less than one percent of the total statewide enrollment in grades K through 12), the need for specialized services, materials, and equipment. (Ed. Code, § 56327.)  The report must be provided to the parent at the IEP team meeting regarding the assessment. (Ed. Code, § 56329, subd. (a)(3).)

11.      A school district's failure to conduct appropriate assessments or to assess in all areas of suspected disability may constitute a procedural denial of a FAPE. (*Park v. Anaheim Union High School District, et al.* (9th Cir. 2006) 464 F.3d 1025, 1031-1033.)

36

12.    When developing an IEP, the IEP team must consider whether the student requires assistive technology devices and services. (Ed. Code, § 56341.1, subd. (b)(5).) "Assistive technology device" is defined as "any item, piece of equipment or product system [other than a surgically implanted device] . . . that is used to increase, maintain or improve functional capabilities of an individual with exceptional needs." (20 U.S.C. § 1401(1); Ed. Code, § 56020.5.)

13.    In matters alleging procedural violations, the denial of a FAPE may only be shown if the procedural violations impeded the child's right to a FAPE, significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE, or caused a deprivation of educational benefits. (Ed. Code, § 56505, subd. (f)(2); see also *W.G. v. Board of Trustees of Target Range School District No. 23* (9th Cir. 1992) 960 F.2d 1479, 1484.)

14.    Student has failed to show a failure of FAPE for the 2007-2008 school year because District did not assess in all areas of suspected. From February 2008 (2 years before filing) to the end of ninth grade, the District provided Student with a FAPE. Parents accepted the January 26, 2007 transition IEP offer of services held at the Lancaster School District, while Student was still in the eighth grade, which included Student's offer of placement and services for Student's ninth grade year at Eastside. (Factual Finding 5.)

15.    No evidence supports the Student's contention that District did not assess in all areas of suspected disability. Student came to the District with an eligibility of specific learning disability, a component of which was dyslexia. Additionally, Student suffered from CMT. Student received assistive technology as part of his related services, based upon an assistive technology assessment of September 2006. Student's triennial IEP was scheduled for the fall of 2008. The law does not require that a school district assess merely because the student is new to the district. Student did not submit any evidence of a suspected disability not previously assessed and no evidence indicated that Student required reassessment in an area of known disability. (Factual Findings 9, 10, 14 through 21, 33.)

16.    Student has met his burden of proof and demonstrated that District failed to provide a FAPE in the 2008-2009 school year. The District did not assess Student in all areas of suspected disability and needed related services, for assistive technology. The failure to conduct an appropriate assessment in AT was a procedural violation which significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE and caused Student a deprivation of educational benefits. Two factors contributed to this conclusion that a procedural violation occurred in the fall of 2008.

17.    First, the fall of 2008 IEP was the Student's triennial. Under special education law, a pupil must be reassessed at least every three years. (20 U.S.C. § 1414(a)(2)(B)(i)-(ii), 34 C.F.R. § 300.303(b) (2006).) As part of a reassessment, the IEP team is required to: review existing assessment data, information provided by the parents, observations, present levels of performance and educational needs; identify, with input from the parents, what

37

additional data, if any, is needed to determine continued eligibility; present levels of performance and educational needs; and determine whether any additions or modifications to the special education and related services are needed to enable the pupil to meet the annual goals and participate in the general curriculum. (34 C.F.R. § 300.305; Ed. Code § 56381.) The school psychologist performed a thorough and thoughtful psychoeducational summary report. Mr. Morgan determined that Student had visual processing and sensory-motor skills disorders, with a discrepancy in reading and written language. Aware that Student had been identified as dyslexic, Mr. Morgan conducted a battery of tests designed to identify the disorder. He concluded that Student was indeed dyslexic, which Mr. Morgan described as a component of Student's visual processing disorder. Mr. Morgan confirmed specific learning disability eligibility. (Factual Findings 10, 42 through 45.)

18. Mr. Morgan also researched Student's CMT, reviewing Student's prior psychoeducational report of January 2005, which observed that Student had significant difficulties with fine-motor skill and becomes easily fatigued when writing. Mr. Morgan stated in his report that Student's CMT disease could cause, in addition to affecting gross motor strength and skills, progressive arm weakness as distal muscles atrophy. The school psychologist recommended that the triennial IEP team consider if the disease limited Student's vitality and alertness, which adversely affect educational performance and, if so, consider whether other health impairment (OHI) should be a secondary eligibility. (Factual Findings 41, 51.)

19. The second factor which contributed to this finding of a procedural violation was that, by the time of the triennial IEP, Student simply did not use the AlphaSmart AT device. The reconvened November triennial IEP meeting primarily focused on Student's AT. In Student's presence, Mother clearly told the IEP team that Student did not use the AlphaSmart. She sought alternative AT which Student would use and came with a number of suggestions. The AT technician's response was for Student to learn to type. As a consequence, much of the hearing consisted of witnesses and counsel sparing over when Student received the SpongeBob typing program, if the family had computers at home to run the program, and whether Student made sufficient efforts to use the program. The District did not accept any of Mother's suggested AT alternatives, not even a willingness to further explore options, other than a discussion that Mr. Cook thought word prediction software might be helpful. (Factual Findings 71 through 79.)

20. The District had now documented in the triennial IEP that Student had dyslexia and his CMT could affect his fine-motor skills in his arms. The IEP team concluded that CMT's affect upon Student's gross motor skills justified a secondary eligibility of OHI. The record also unambiguously established that Student did not use the AlphaSmart and, therefore, could not benefit from the AT. The IEP team acknowledged that Student needed AT devices to access his curriculum. District was required to conduct a comprehensive AT assessment which would consider whether Student's ability to utilize the AlphaSmart, or any other similar keyboard device, was affected by: a deficiency in fine-motor skills of the arms and hands, decreased strength and stamina, and the effect of dyslexia and a visual processing

38

disorder on Student's ability to see the AlphaSmart's screen.  (Factual Findings 57, 71 through 79.)

21.     The District interpreted Student's failure to use the AlshpaSmart and his subsequent AT device, the Fusion, as resistance.  District contended that Student lacked motivation and focus.  The District documented Student's non-use of his AT when it should have been conducting a thorough assessment which could be used to create AT-related services which strategically included Student's unique needs so that AT would further enable Student to access his curriculum.  The AT technician's belief that Student needed to type may have been accurate.  However, District assumed the cause was Student's resistance and lack of motivation.  Knowing that Student was not benefiting from his AT-related services put the District on notice to make concerted efforts and inquiries to develop AT-related services which benefited Student.  (Legal Conclusions 10, 12.)

22.     The failure to fully assess student for AT-related services is a procedural violation which amounts to the denial of a FAPE.  Having found a procedural violation, it must then be determined if the violation impeded the child's right to a FAPE, significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE, or caused a deprivation of educational benefits.   The Parents ability to participate in the decision-making process regarding the provision of a FAPE, including the AT-related services, was significantly impeded.  Mother specially said that Student did not use the AlphaSmart, wanted to return the AlphaSmart, and wanted to discuss alternative AT services which would benefit Student.  Mother proposed alternatives, which were not accepted.  The District continued to focus on its belief that Student was not motivated.  Without an assessment, this was a guess.  Without an assessment, Parents' opportunity to participate in the decision-making process for AT-related services was significantly impeded.  Also, all of the District IEPs for Student affirmatively state that Student required AT-related services to access his curriculum.  Other than color overlays, Student did not have any related AT service because the AlphaSmart was not being used.  The lack of a comprehensive AT-related service, designed for Student's unique needs, which included his ability to make use of the AT, deprived Student of educational benefit.  Therefore, the statutory threshold is met and the failure to fully assess Student for AT-related services is a procedural violation which amounts to the denial of a FAPE as of the October 2008 triennial IEP.  (Factual Findings 71, 75; Legal Conclusions 11, 14.)

23.     Like the previous year, Student has met his burden of proof and demonstrated that District failed to provide a FAPE in the 2009-2010 school year, by failing to assess for AT-related services.

24.     The District did not assess Student in all areas of suspected disability and necessary related services, for assistive technology.  The failure to conduct an appropriate assessment in AT was a procedural violation which significantly impeded Parents' opportunity to participate in the decision-making process regarding the provision of FAPE and caused Student a deprivation of educational benefits.  (Factual Findings 104 through 108, 126; Legal Conclusions 11, 14.)

39

25.     District tried to address Student's AT needs by purchasing and providing a
Fusion device, which seemingly included much of the software and features which would
benefit Student.  However, the change or upgrade in the AT device was not based on a
comprehensive assessment of Student's AT capabilities and needs.  Like the AlphaSmart, the
Fusion was a keyboard, which required Student to type.  The Fusion had a gray scale screen,
about three by seven inches.  Student testified that the screen reflected, which caused the
words to move around.  He also testified that the Fusion was too heavy.  Student also
suggested a different strategy for his AT, which consisted of having software on various
computers in his classrooms and at home, eliminating the deficiencies of carrying a Fusion.
(Factual Findings 106, 107, 126, 155 through 158.)

26.     Without a comprehensive AT assessment, neither District nor Parent could
knowledgeably address Student's AT needs.  District's AT approach was to decide what
Student needed, give it to him, monitor the AT use, and blame him if AT did not help.

27.     The October 2009 Annual IEP team reviewed the ITOI Peter Clarkson's
Report of Itinerant Orthopedic Impairment Teacher.  The ITOI report stated that Student gets
tired and does not have the energy to practice typing at home.  The ITOI also reviewed the
Student's challenges of moving about the newly constructed, large Eastside campus.  Though
this report was primarily addressing Student's mobility concerns, the report did confirm that
Student's CMT affected Student's ability to use the AT provided by District.  Yet, at the
hearing, the District's AT technician, who decided that the Fusion was the AT needed by
Student, said he was unaware that Student had limited physical strength.  (Factual Findings
107, 112, 113.)

28.     District was required to conduct a comprehensive AT assessment which would
consider whether Student's ability to utilize the Fusion, or any other AT device, was affected
by: a deficiency in fine-motor skills of the arms and hands, decreased strength and stamina,
and the effect of dyslexia and a visual processing disorder on Student's ability to see the AT
device screen.  The lack of a comprehensive AT-related service, designed for Student's
unique needs, which included his ability to make use of the AT, deprived Student of
educational benefit.  Therefore, the statutory threshold is met and the failure to fully assess
Student for AT-related services is a procedural violation which amounts to the denial of a
FAPE since the 2009 annual IEP.

29.     In summary, Student has met its burden and demonstrated that District has
failed to provide a FAPE for the 2008-2009 and 2009-2010 school years because it failed to
assess Student for AT-related services and, thus, failed to assess in all areas of suspected
disability (Issues 2a and 3a).  Student failed to meet his burden as to the 2007-2008 school
year (Issue 1a).

*Issues 1b & c, 2b & c, 3b & c, Goals*

30.     Student contends that he was denied a FAPE from February 11, 2008, through
the filing of his due process hearing request because at all times his operative IEPs failed to

40

include goals in all areas of need (Issues 1b, 2b, 3b) and because the goals were inappropriate (Issues 1c, 2c, 3c).  District contends that it provided appropriate goals in all areas of need.

31.    The IEP is the "centerpiece of the [IDEA's] education delivery system for disabled children" and consists of a detailed written statement that must be developed, reviewed, and revised for each child with a disability. (*Honig v. Doe* (1988) 484 U.S. 305, 311 [108 S.Ct. 592, 98 L.Ed.2d 686]; 20 U.S.C. §§ 1401 (14), 1414 (d)(1)(A); Ed. Code, §§ 56032, 56345.)  In developing the IEP, the IEP team shall consider the strengths of the child, the concerns of the parents for enhancing the education of their child, the results of the initial evaluation or most recent evaluation of the child, and the academic, functional and developmental needs of the child.  (20 U.S.C. § 1414(d)(3)(A).)

32.    An IEP is a written statement for each individual with exceptional needs that includes, in relevant part: 1) A statement of the individual's present levels of academic achievement and functional performance; 2) A statement of measurable annual goals, including academic and functional goals, designed to meet the student's unique needs and enable the student to be involved in and make progress in the general education curriculum; 3) A description of the way progress on goals will be measured and reported; and 4) A statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the pupil, or on behalf of the pupil, and a statement of the program modifications or supports for school personnel that will be provided to enable the pupil to advance appropriately toward attaining the annual goals and be involved in and make progress in the general education curriculum. (20 U.S.C. § 1414(d)(1)(A); 34 C.F.R. § 300.320(a); Ed. Code, § 56345, subd. (a.).)  The IEP must include: a projected start date for services and modifications, and the anticipated frequency, location and duration of services and modifications.  (20 U.S.C. § 1414(d)(1)(A)(i)(VII); 34 C.F.R. § 300.320(a)(7); Ed. Code, § 56345, subd. (a)(7).)  The IEP must show a direct relationship between the present levels of performance, the goals, and the educational services to be provided.  (Cal. Code Regs., tit. 5, § 3040, subd. (c).)

33.    A student's IEP must include a statement of measurable goals based on transition assessments and an outline of the services needed to assist the child in reaching those goals.  (20 U.S.C. § 1414(d)(1)(A)(i)(VIII).)  Only the information set forth in title 20 United States Code section 1414(d)(1)(A)(i) must be included in the IEP and the required information need only be set forth once.  (20 U.S.C. § 1414(d)(1)(A)(ii); 34 C.F.R. § 300.320(d); Ed. Code, § 56345, subds. (h) & (i).)

34.    Student did not submit evidence demonstrating an area of need for which District failed to create goals.  Similarly, the goals and accompanying objectives and benchmarks, appropriately addressed the areas of need.

35.    Since Student had met his goals from the pervious annual IEP, the September 2007 annual IEP team developed goals in reading, math, writing, and transition.  The reading PLOP cited Student's Lexile score, recently taken as a baseline in his READ 180 class, which he had already started.  The reading objectives were consistent with the

41

comprehensive READ 180 program, which regularly measures Student's progress and adjusts to meet his unique needs. The math PLOP was based upon Student's most recent STAR scores, which highlighted Student's struggles with multi-step problems. The IEP developed a math goal and objectives designed to improve Student's understanding of multi-step problems so he could be successful in algebra. The writing PLOP observed that Student could write simple sentences and a paragraph, but needed to expand his writing into more complex sentences. The writing goal and objectives were to develop Student's ability to understand sentence structure and to write more complex sentences. (Factual Findings 24 through 31.)

36.     Student has not met his burden of demonstrating that the October 2008 triennial IEP failed to include goals in all areas of need and that the goals were inappropriate, amounting to a substantive procedural violation which caused a FAPE failure. Other than the failure to perform an AT-related services assessment, the District fully assessed Student in preparation for the triennial IEP. The psychoeducational assessment of the District school psychologist, Mr. Morgan, was thorough and thoughtful. Any deficiencies or errors in standardized testing protocols were minor and did not substantively affect the testing outcome. He carefully considered CMT and its affect upon Student, even suggesting a secondary eligibility of OHI. The triennial IEP team evaluated Student's CMT in light of the triennial assessment and chose to make OHI a secondary eligibility. (Factual Findings 41 through 53.)

37.     The special education teacher reviewed Student's progress, stating the Student had met the annual goals. The IEP team developed new goals in reading, math, writing, Transition (self-awareness), transition (self-advocacy), and APE. Student did not introduce evidence indicating an area of need for which District failed to create a goal. The goals and accompanying objectives and benchmarks, appropriately addressed the areas of need. (Factual Findings 58, 59, 61 through 64.)

38.     The reading PLOP cited Student's KTEA II reading comprehension score of 70 but noted that the Letter and Word Identification score of 66 indicated Student needed improvement. The IEP team developed a measurable goal and accompanying objectives to increase Student's knowledge and use of antonyms, synonyms, homophones and homographs in determining the meaning of words. The math PLOP was based upon the KTEA II Concepts and Applications test results, noting that Student needed improvement in Math Computation. The IEP team created a measurable goal and objectives related to Student's application of algebraic order of operation and the commutative, associative, and distributive properties to evaluate expressions, justifying each step. For writing applications, the PLOP cited Student's KTEA II Written Language score but noted a low score in Spelling. The IEP team created a measurable annual goal and objectives to improve Student's ability to proofread for errors in spelling, grammar, capitalization, and punctuation. (Factual Findings 59, 61, 62.)

39.     Student has not met his burden of demonstrating that the September 2009 IEP, the 2009 annual IEP, nor the October 22, 2009 IEP, failed to include goals in all areas of

42

need and that the goals were inappropriate, amounting to a substantive procedural violation which caused a FAPE failure. Other than the failure to perform an AT-related services assessment, the District fully assessed Student in preparation for the 2008 annual IEP. The IEP team considered the ITOI report and changed Student's secondary eligibility from OHI to OI, thereby qualifying Student for funding and services afforded to a "low-incidence disability." The IEP team instituted the two goals which the ITOI recommended and drafted. One goal was for vocational skills to develop the personal quality of using his power mobility device to arrive timely for class. The other related goal was in language and communication, establishing measurable objectives toward the measurable goal of Student practicing his typing. The ITOI report indicated that Student's use of a mobility device will help Student maintain energy sufficient to work on his typing at home. (Factual Findings 112 through 115, 127.)

40.     The IEP team developed new goals in algebra, written language, and reading. The reading PLOP, or "baseline," cited Student's ability to comprehend reading passages and his ability to answer a variety of questions. The reading goal and objectives were for measurable progress toward analyzing recurring themes across works. The Written Language baseline was that Student could write simple sentences, with measurable goals and objectives choosing and writing the best form for an intended purpose. The algebra baseline was that Student can solve equations with unknown variables and also add, subtract, and multiply monomials and polynomials, with the measurable goal and objectives of correctly factoring and reducing such equations to the lowest terms. (Factual Findings 127, 128, 129.)

41.     In summary, Student has failed to meet his burden of establishing that District failed to include goals in all areas of need (Issues 1b, 2b, 3b) and because the goals were inappropriate (Issues 1c, 2c, 3c).

*Issues 1d, 1e, 1f, 2d, 2e, 2f, 3d, 3e, and 3f, Math, Reading and Writing*

42.     Student contends that he was denied a FAPE from February 11, 2008, through the filing of his due process hearing request because at all times his operative IEPs failed to offer sufficient supports in the areas of math (Issues 1d, 2d, 3d), reading (Issues 1e, 2e, 3e), and writing (Issues 1f, 2f, 3f). District contends that it provided Student with sufficient support and services in the areas of math, reading, and writing.

43.     For the 2007-2008 school year, Student has failed to meet his burden of demonstrating that the areas of math, reading and writing were not sufficiently supported by the IEP's offered services and the services which were actually delivered. Student received special education instruction in the READ 180 program, which provided systematic study that addressed Student's unique needs in reading. Similarly, the writing goal and objectives were part of Student's special education Literature Support class, where Student wrote essays associated with his READ 180 program. Though the special education Pre-Algebra class proved to be more challenging to Student, Student made progress toward his Math goal. The evidence does support the conclusion that Student was not sufficiently supported in the areas of math, reading, or writing. (Factual Findings 25, 28, 29, 35 through 38.)

43

44.     Similarly, for the 2008-2009 school year, the areas of math, reading and writing were sufficiently supported by the October 2008 triennial IEP offered services and the services which were actually delivered.  Student received special education instruction in the second year of the READ 180 program, having advanced after achieving measurable benchmarks in his first year.  Student made progress toward his writing goal and objectives, which were part of Student's special education Lit. Support 2 class, where Student wrote essays associated with his READ 180 program.  Student made progress toward his Math goal and objectives in the special education Algebra 1A class.  The evidence does not support the conclusion that Student was insufficiently supported in the areas of math, reading, or writing.  (Factual Findings 58 through 59, 80 through 84.)

45.     Student has not met his burden of demonstrating that the September 2009 IEP, the 2009 annual IEP, nor the October 22, 2009 IEP, failed to provide sufficient support in the areas of math, reading, and writing.  To the date of the hearing, Student made progress toward his goals in math, reading, and writing.  Student's most recent progress report demonstrated that Student was performing well in his core classes.  (Factual Finding 159.)

46.     In summary, Student has failed to meet his burden of demonstrating that he was denied a FAPE from February 11, 2008, through the filing of his due process hearing request because at all times his operative IEPs failed to offer sufficient supports in the areas of math (Issues 1d, 2d, 3d), reading  (Issues 1e, 2e, 3e), and writing (Issues 1f, 2f, 3f).

*Issues 1g, 2g, 3g, Appropriate Assistive Technology*

47.     Student contends that he was denied a FAPE from February 11, 2008, through the filing of his due process hearing request because at all times his operative IEPs failed to offer appropriate assistive technology (Issues 1g, 2g, 3g).  District contends that it provided Student appropriate assistive technology at all times.

48.     Student has failed to meet his burden in establishing that District failed to offer appropriate assistive technology for the 2007-2008 school year (Issue 1.g).  District provided the assistive technology which Student had been receiving, which was supported by an assistive technology assessment from the previous year.  At the time of the September 2007 IEP, District was not in possession of any information, which indicated that Student was not benefiting from the AT services.  (Legal Conclusion 15.)

49.     However, Student has met his burden of demonstrating that the District failed to offer appropriate assistive technology for the 2008-2009 and 2009-2010 school years (Issues 2g, 3g).  As found hereinabove for these two school years, District failed to assess Student for assistive technology and had thus failed to assess in all areas of suspected disability.  This procedural violation amounted to the denial of a FAPE because it significantly impeded Parents' opportunity to participate in the decision-making process regarding the assistive technology-related services and caused a deprivation of educational benefit to Student.  (Legal Conclusions 21, 28.)

44

50.     Without a proper AT assessment, District's offers of AT-related services were not designed to provide Student access to his curriculum. As previously discussed in greater detail, the offered AT-related services were therefore based upon conjecture. The offered AT services therefore could not assist the Student in benefiting from special education. (See Ed. Code, § 56363, subd. (a).) (Legal Conclusions 26.)

51.     In summary, Student has met his burden of demonstrating that District failed to offer appropriate assistive technology for the 2008-2009 and 2009-2010 school years (Issues 2g, 3g) but not for the 2007-2008 school year (Issue 1g).

*Issues 1h, 2h, 3h, Transition Plan*

52.     Student contends that he was denied a FAPE from February 11, 2008, through the filing of his due process hearing request because District did not create an appropriate transition plan. (Issues 1h, 2h, 3h). District contends that at all times it provided an appropriate transition plan.

53.     The IDEA defines "transition services" as "a coordinated set of activities for a child with a disability that":

(A) is designed to be within a results-oriented process, that is focused on improving the academic and functional achievement of the child with a disability to facilitate the child's movement from school to post-school activities, including post-secondary education, vocational education, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation;

(B) is based on the individual child's needs, taking into account the child's strengths, preferences, and interests; and

(C) includes instruction, related services, community experiences, the development of employment and other post-school adult living objectives, and, when appropriate, acquisition of daily living skills and functional vocational evaluation.

(20 U.S.C. § 1401(34).)

54.     Transition services may consist of specially designed instruction or a designated instruction and service. (34 C.F.R. § 300.43(b); Ed. Code, § 56345.1, subd. (b).) Where the transition services are to be provided by outside agencies, the outside participating agencies should be identified, and invited to any IEP meetings where their funding or provision of those services is involved.

55.     The failure to properly formulate a transition plan may be a procedural violation of the IDEA that warrants relief only upon a showing of a loss of educational opportunity or the denial of a FAPE. (*Board of Education v. Ross* (7th Cir. 2007) 486 F.3d 267, 276 [despite transition plans being a mandatory component of an IEP, notation in IEP

45

that the transition plan would be "deferred" was a procedural violation]; *A.S. v. Madison Metro School Dist.* (D. Wis. 2007) 477 F.Supp.2d 969, 978 [allegation of inadequate transition plan treated as a procedural violation].)

56.     Student failed to demonstrate that he was denied a FAPE either because the transition plan was not properly written or because the goals and services in his IEP were inappropriate to support the transition plan.  District created an appropriate transition plan at the September 2007 IEP, which met the requirements of the IDEA.  Student stated that he wanted to be a stock broker.  The transition plan utilized the tool of "career cruising" while Student's transition goal and objectives concentrated on Student's need to better understand his disability and explain to others his accommodation needs.  As pointed out by Student's case manager Ms. Chapleau, the transition plan and goal were not merely to state and pursue what the Student thought he wanted to do as a career but to provide Student with the tools necessary to evaluate his abilities and explore career options.  The District's career cruising program provided Student with measurable means of examining himself and his career options.  To further this goal, Student would need to make academic progress to the extent he was able in all subjects required for high school graduation.  In sum, the transition plan, goals and objectives were properly drafted to further Student's goal a job in the stock market. (Factual Findings 30, 31.)

57.     Student failed to demonstrate that he was denied a FAPE either because the transition plan was not properly written or because the goals and services in his IEP were inappropriate to support the transition plan for the 2008-2009 school year.  The triennial IEP's Transition to Adult Life Plan stated that the career-interest inventory was to be completed in the regular classroom by September 2009.  The Plan stated that Student would be attending community college within one year of exiting high school.  In the transition Self-Awareness goal, the PLOP noted Student's desires to follow the stock market and to be a stock broker.  The goal and objectives were for Student to develop a transition portfolio in the classroom regarding personal information, strengths, career-interests, resources for adult support, measured by work samples and observation records.  The transition Self-Advocacy goal and objectives encouraged Student to be better aware of his environment and the need to monitor and address his body temperature, so he could take appropriate preventive or remedial measures if too cold or too hot.  The transition plan, goals and objectives were properly drafted for the Student's sophomore year.  (Factual Findings 63, 64.)

58.     For the 2009-2010 school year, the Transition goal's PLOP was Student's participation in the YES class and in the progress he made on his transition portfolio.  The transition goal and objectives were for Student to continue to add workplace documents to this transition portfolio as measured by completed job applications, resumes, and cover letters.  Extensive testimony and documentation was received regarding the YES class.  YES is highly structured class which partners with businesses and organizations to give students opportunities to experience work environments and explore a wide variety of potential careers.  Though students are given similar assignments, each student completes the assignment based upon each student's unique career capabilities and interests.  Associated with the YES class was the services Student receives as a Department of Rehabilitation

46

client. At the time of hearing, Student was working a job with the assistance of the DOR. The Transition Plan , which included the YES class as the means of achieving the goal, was appropriate. (Factual Findings 116, 119 through 122.)

59.    In summary, the Student has failed to meet his burden of demonstrating he was denied a FAPE from February 11, 2008, through the filing of his due process hearing request, because District did not create an appropriate transition plan. (Issues 1h, 2h, 3h).

*Issues 1i, 2i,3i, Need to Convene IEPs for Lack of Progress*

60.    Student contends that he was denied a FAPE from February 11, 2008, through the filing of his due process hearing request because District did not convene special IEP meetings when Student demonstrated a lack of anticipated progress (Issues 1i, 2i, 3i). District contends that it was not obligated to convene an IEP because Student demonstrated progress toward his goals and objectives.

61.    The Student has failed to meet his burden of providing evidence sufficient to support the contention. Though Student may have struggled with some of his goals and received lower grades (never an F) in some courses, Student did not submit evidence which indicated that Student was not making educational progress or had otherwise lost educational opportunity. The progress reports and testimony support a finding that the District was not obligated to convene an IEP meeting because the progress reports and grades demonstrate educational progress. Student did not lose educational opportunity because District did not convene special IEP meetings. (Factual Findings 35 through 38, 80 through 84, 159.)

62.    In summary, Student has failed to meet his burden of showing that Student demonstrated a lack of anticipated progress which required District to convene an IEP meeting. (Issues 1i, 2i,3i.)

*Issue 3j, Accommodations in 2009-2010 School Year for Mobility*

63.    Student contends that the District failed to provide Student with necessary and reasonable accommodations for the 2009-2010 year and, thus, failed to provide a FAPE. This contention has to do with Student's mobility needs on the newly constructed Eastside campus, which opened to more than 2,300 students in the fall of 2009 and was not an issue until the new campus opened. District contends that it offered necessary and reasonable accommodations to Student, but Parents and Student declined.

64.    The IEP also must include a statement of the program modifications or supports for school personnel that will be provided to the pupil to allow the pupil to advance appropriately toward attaining the annual goals and be involved and make progress in the general education curriculum and to participate in extracurricular activities and other non-academic activities. (34 C.F.R. § 300.320(a)(4)(i), (ii); Ed. Code, § 56345, subds. (a)(4)(A), (B).)

65.    Student has failed to meet his burden of showing that the District failed to provide necessary and reasonable accommodations related to Student's mobility on the new Eastside campus, causing a FAPE failure. The Factual Findings carefully review the evidence related to the two mobility concerns: elevator access to the second floor and Student's ability to move about the larger Eastside campus.

66.    The District reasonably declined to provide Student or Parents with keys to an otherwise secured gate or keys to an elevator, which was otherwise not available to the general student body, because of legitimate concerns for safety, liability, and security.

67.    Presently, District has provided elevator keys to Student's teachers and aide for his fifth period class, which is on the first floor, and his sixth period class, which is on the second floor. Upon Student's request, these teachers and aide will use the elevator key so Student can use the elevator instead of the stairs. Additionally, when Student wants to use the second floor library or student center, he can ask any of these teachers and aide or, if they are unavailable, call Security. (Factual Findings 102, 103, 125.)

68.    At the beginning of this school year, Student was only to use Security for elevator access. This proved difficult, because Security was not always available and Student would sometimes have to wait and he would be late for class. Like the Student, the District was similarly attempting to devise a system which would meet Student's needs while maintaining its justifiable concerns for safety, liability, and security. Recognizing that the exclusive use of Security was insufficient, the District soon distributed keys to the teachers and aide who could assist Student in accessing the elevator. (Factual Findings 102, 124, 125.)

69.    Student testified that he still often took the stairs, recognizing it poses risks. However, as Student's expert Dr. Bernstein clearly stated, the choice is Student's. The doctor could not say that Student cannot take stairs; only that Student can evaluate risk, balance and stamina and make his own choice. The system which was in place at the time of the hearing required Student to ask a teacher, aide or Security. If Student chooses not to use this option and take the stairs, it is his choice. The options provided by District for Student's use of the elevator are reasonable. (Factual Findings 148.)

70.    The second mobility issue concerns Student's movement about a much larger campus. The Student focused on where Student would be dropped off in the morning and picked up in the afternoon. Mother and Student wanted access past an otherwise locked security gate so Student could use a pedestrian gate which was much closer to his first period class. The District declined to give Parents or Student a key to the locked gate because of security, liability, and safety concerns, which were legitimate and reasonable. Also, District reasonably declined to have someone posted at the gate to await Student's arrival. (Factual Findings 92, 93, 96.)

71.    The only alternative which Parents and Student would accept was for Student to be allowed to use his razor scooter to go to his first period class and return from his last

period class.  Student was asking to use the razor scooter on campus.  The District declined, properly citing the safety concerns posed by the use of the razor scooter on a campus crowded with students in the hallways and to Student himself.  (Factual Finding 98.)

72.     District offered a wheelchair and aide; Parents declined.  Parents wanted one of Security's carts to transport Student, with an aide.  District declined because it could not guarantee the availability of a cart that had to be available for Security.  (Factual Findings 99, 133, 134.)

73.     District offered to provide Student with a motorized, three-wheeled scooter, called the Buzzaround Lite.  Parents and Student strongly objected, saying if was contrary to doctors' recommendation and not medically appropriate.  This scooter was recommended by the OTOI in his fall 2009 report.  The IEP team changed Student's secondary eligibility from OHI to OI, allowing access to "low-incidence" funding to purchase the motorized scooter. The District now has the motorized scooter but Parents and Student will not accept its use. (Factual Findings 113, 115, 141.)

74.     However, Student's expert, Dr. Bernstein, identified the motorized scooter as the type of mobility device he recommends for Student.  Though he said it was good exercise for Student to walk when possible, Dr. Bernstein suggested that Student use the motorized scooter for longer distances or "off" days.  The District had offered the mobility device recommended by Student's expert.  (Factual Findings 150, 151.)

75.     Student has failed to meet his burden.  The District has provided reasonable accommodations to meet Student's mobility needs and such accommodations are properly documented in the IEPs.

*Issue 3k, Present Levels of Performance in October of 2009 IEP*

76.     Student contends that he was denied a FAPE because the October 8, 2009 annual IEP failed to include adequate present levels of performance.  District contends that the 2009 annual IEP's PLOPs are adequate.  The 2009 annual IEP refers to a PLOP as a "baseline."

77.     Failure to include adequate PLOPs is a procedural violation.  Thus, even if the PLOPs are inadequate, the Student must also show by a preponderance of the evidence that the procedural violation significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE or caused a deprivation of educational benefits.  (Ed. Code, § 56505, subd. (f)(2).)

78.     The PLOPs have been reviewed within the context of the goals and objectives, which were found to be sufficient.  However, even if the baselines were found not to be adequate, Student has failed to meet his burden of providing evidence that there was a loss of educational opportunity for Student or that Parent was denied an opportunity to participate in the IEP process.  (Factual Findings 112 through 115, 127; Legal Conclusions 39, 40, 41.)

79.     Accordingly, Student has failed to meet his burden of showing by a preponderance of the evidence that the PLOPs in the October annual IEP were inadequate or, if inadequate, met the statutory standard for a procedural violation causing the denial of aa FAPE. (Issue 3k.)

*The Remedy*

80.     Federal law provides that a court that hears a civil action taken from a special education administrative due process hearing "shall grant such relief as the court deems appropriate." (20 U.S.C. § 1415(i)(2)(C)(iii); 34 C.F.R. § 300.516(c)(3)(2006).) The United States Supreme Court has held that this authority "confers broad discretion on the court" to grant relief that is appropriate in light of the purpose of the IDEA. (*School Committee of the Town of Burlington, Massachusetts v. Department of Education* (1985) 471 U.S. 359, 369 [105 S.Ct. 1996, 85 L.Ed.2d 385].) The broad authority to grant relief extends to the administrative law judges and hearing officers who preside at administrative special education due process proceedings. (*Forest Grove School District v. T.A.* (2009) 557 U.S. ___ [129 S.Ct. 2484, 2494, fn. 11; 174 L.Ed.2d 168] The fashioning of equitable relief in IDEA cases requires a "fact-specific" analysis. (*Parents of Student W. v. Puyallup School District No.* (9th Cir. 1994) 31 F.3d. 1489, 1497.)

81.     The District failed to provide Student with a FAPE in 2008-2009 and 2009-2010 because District did not provide a comprehensive AT assessment. This failure was a procedural violation which significantly impeded Parents' opportunity to participate in the decision-making process regarding the provision of a FAPE and caused Student a deprivation of educational benefits. Consequently, without a proper AT assessment, the District failed to provide appropriate and adequate AT-related services.

ORDER

1      Within 45 days, District shall provide and pay for an independent Assistive Technology assessment of Student.

2      The AT assessment shall specifically address how Student's visual processing disorder, dyslexia and CMT affect Student's ability to access proposed AT technology. The AT assessment shall provide specific strategies which would enable Student to utilize the AT to access his curriculum. The AT assessment shall also propose measurable benchmarks which will indicate if Student's AT is enabling him to access his curriculum. A timely convened IEP team meeting shall meet to consider the AT assessment's recommendations, strategies, goals and measurable benchmarks.

50

PREVAILING PARTY

Education Code section 56507, subdivision (d), requires that this Decision indicate the extent to which each party prevailed on each issue heard and decided in this due process matter.  Student prevailed on the issue that District failed to assess in all areas of suspected disability (AT) and failed to provide appropriate AT, resulting in the denial of a FAPE for the 2008-2009 and 2009-2010 school years (Issues 2a, 2g, 3a and 3g).  District prevailed on all other issues.


RIGHT TO APPEAL THIS DECISION

This is a final administrative Decision, and all parties are bound by it.  Pursuant to Education Code section 56506, subdivision (k), any party may appeal this Decision to a court of competent jurisdiction within ninety (90) days of receipt.


DATED: May 26, 2010


_____/s/_____
CLIFFORD H. WOOSLEY
Administrative Law Judge
Office of Administrative Hearings

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge John F. Walter and the assigned discovery Magistrate Judge is Rosalyn M. Chapman.

The case number on all documents filed with the Court should read as follows:

## CV10- 6313 JFW (RCx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=========================================:

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| [X] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)      NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

COPY

Name & Address:
Janeen Steel (CA SBN 211401)
LEARNING RIGHTS LAW CENTER
205 S. Broadway, Suite 1008
Los Angeles, CA 90012    Ph: 213-489-4035

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

ADAM ROBEDEAUX,

PLAINTIFF(S)

v.

ANTELOPE VALLEY UNION HIGH SCHOOL
DISTRICT, a public entity

DEFENDANT(S).

CASE NUMBER

CV10 6313 -JFW (RCx)

**SUMMONS**

TO:    DEFENDANT(S):  ANTELOPE VALLEY UNION HIGH SCHOOL DISTRICT, a public entity

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, ____Janeen Steel, Esq.____, whose address is ____205 S. Broadway, Suite 1008, Los Angeles, CA 90012____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: __2 4 AUG 2010__

By: _____

MARILYN DAVIS

Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

CV-01A (12/07)    **SUMMONS**

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| ADAM ROBEDEAUX | ANTELOPE VALLEY UNION HIGH SCHOOL DISTRICT, a public entity |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Janeen Steel (CA SBN 211401) - LEARNING RIGHTS LAW CENTER<br>Asaf Orr ( CA SBN 261650)<br>205 S. Broadway, Suite 1008, Los Angeles, CA 90012  ph:213-489-4035 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:  JURY DEMAND:** ☐ Yes  ☑ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☑ No  ☐ MONEY DEMANDED IN COMPLAINT: $ _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause.  Do not cite jurisdictional statutes unless diversity.)
Individuals with Disabilites Education Improvement Act (IDEIA) 20 USC section 1415 et seq. Plaintiff files this action to Request Relief from Administrative Hearing Deci

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | IMMIGRATION | | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | ☑ 440 Other Civil Rights | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 245 Tort Product Liability | | | | |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:**  Case Number: _____ **CV10 6313**

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

COPY

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

VIII(a).  IDENTICAL CASES: Has this action been previously filed in this court and dismissed, remanded or closed?  ☑ No   ☐ Yes
If yes, list case number(s): _____

VIII(b).  RELATED CASES: Have any cases been previously filed in this court that are related to the present case?  ☑ No   ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)   ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
                               ☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
                               ☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
                               ☐ D.  Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

IX.  VENUE:  (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
        Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved.

X.  SIGNATURE OF ATTORNEY (OR PRO PER): _____    Date  8/24/10

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings
or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed
but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program.  (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability.  (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended.  (42 U.S.C. (g)) |